**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| ROBERT L. THOMAS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. CIV-07-0121-F |
| | ) | |
| METROPOLITAN LIFE INSURANCE | ) | |
| COMPANY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**<u>ORDER</u>**

Defendants' motion to dismiss, filed September 24, 2007, is before the court. (Doc. no. 98.)  The motion has been fully briefed and is ready for determination.

I. <u>Background and Summary of Claims</u>

The Second Amended Class Action Complaint ("SAC" or "the complaint," doc. no. 91) is brought by three plaintiffs, Robert L. Thomas, Carolyn Ising and Jay Stout. These plaintiffs seek to bring class action claims on behalf of various sub-classes of potential plaintiffs, although no class has been certified and no class issues are before the court at this time.   All claims are alleged against two defendant entities, Metropolitan Life Insurance Company and MetLife Securities, Inc. (referred to collectively in this order as "MetLife").

Summarized broadly, the complaint seeks recovery for fees paid by the plaintiffs to MetLife as a result of alleged material omissions concerning MetLife's conflicts of interest, made in connection with sales to plaintiffs by MetLife of

MetLife's proprietary products, including mutual funds and term life insurance.[1] MetLife's motion challenges all claims under Rule 12(b)(6) for failure to state a claim. MetLife's grounds for dismissal include its argument that the complaint fails to allege facts in support of standing.  As standing is jurisdictional, the motion implicitly brings a facial attack under Rule 12(b)(1).

The complaint groups plaintiffs' theories of liability into four counts.  Each count is alleged on behalf of a particular sub-class defined in the complaint.  (SAC ¶ 15.)

Count One alleges securities fraud under the Securities Exchange Act of 1934, § 10(b), (15 U.S.C. § 78j(b)), and under Rule 10b-5, (17 C.F.R. §240.10b-5), ("the securities claims" or "the 10(b) claims").  In this count, plaintiffs seek the return of commissions and fees paid in connection with investment advice provided by MetLife regarding plaintiffs' purchase of MetLife's proprietary funds.[2]  (SAC ¶ 99.) The 10(b) claims are brought under the Private Securities Litigation Reform Act (PSLRA) by a

---

[1]The complaint describes the proprietary products in issue in this action as follows. "The financial plans, MetLife mutual funds, annuities, and MetLife insurance are collectively referred to as 'MetLife Proprietary Products.'"  (SAC ¶ 1.)  With respect to the mutual funds, the complaint states: "In acquiring these funds, MetLife owned the Funds' principal assets.  Because of their proprietary nature, MetLife earned substantially larger investment fees...."  (SAC ¶ 20.)  The court notes that, by definition, ownership is the characteristic condition of something "proprietary."  Thus, although plaintiffs' briefing seeks to expand the definition of proprietary products to include "other mutual fund companies where [MetLife] received special compensation to promote those funds," ( doc. no. 105, p. 4, n.5), that is not the definition of the proprietary products in issue in this action, as defined in the allegations.

[2]The complaint appears to seek other damages as well.  *See*, *e.g.*, allegations seeking fees paid for financial planning services "as well as other damages" (SAC ¶ 6); references to proprietary mutual funds "that consistently failed to be sound investment vehicles free of conflicts of interest" (SAC ¶ 96); allegations that but for MetLife's omissions, "Plaintiffs and members of the class would not have purchased or otherwise acquired their shares of MetLife Mutual funds" (SAC ¶ 100); and prayer for "such other and further relief as this Court may deem just and proper."  (SAC prayer ¶ C.) However, plaintiffs' response brief (doc. no. 105, p. 11) states that their 10(b) claim seeks to recover excessive fees paid and that this claim is not concerned with the value of share price.  The court finds that any securities claims seeking damages based on share price have been abandoned, and any such claims are **DISMISSED**.

proposed sub-class referred to in the complaint as "the National PSLRA Class." This sub-class consists of purchasers of MetLife proprietary mutual funds from January 31, 2002 through the present. (SAC ¶ 15.)

Count Two alleges claims based on Sections 206 and 215 of the Investment Advisors Act, 15 U.S.C. §§ 80b-6, 80b-15 ("the IAA claims"). Count two seeks rescission of plaintiffs' investment advisory contracts with MetLife, and recovery of fees paid in connection with those contracts. (SAC ¶ 110; plaintiffs seek restitution of the fees they paid for the products they purchased. *See, e.g.*, doc. no. 105, pp. 11, 20, 26.) The IAA claims are brought by a proposed sub-class referred to in the complaint as "the National IAA Class." This sub-class consists of persons or entities "that sought financial planning advice and purchased MetLife proprietary products, including but not limited to financial plans, proprietary mutual funds, proprietary insurance products and proprietary annuities from January 31, 2002 through the present." (SAC ¶ 15.)

Count Three alleges violation of the consumer protection and deceptive trade practices acts of 42 states, to the extent that plaintiffs' claims are not otherwise governed by the PSLRA or the Securities Litigation Uniform Standards Act (SLUSA). These state law claims are alleged in connection with the sale of proprietary term insurance only. (SAC ¶112.) Some of these state law claims require separate treatment in this order. Accordingly, the court notes here that count three includes alleged violations of: Missouri Stat. Ann. § 407.020; N.Y. Gen. Bus. Law §349; the Oklahoma Deceptive Trade Practices Act, 78 O.S. 2001 §§ 51-55 ("ODTPA"); and the Oklahoma Consumer Protection Act, 15 O.S. 2001 §§ 751, et seq. ("OCPA"). In this count, plaintiffs seek damages in an amount to be proven at trial. (SAC ¶ 113.) To the extent count three alleges violation of the New York statute, such claims are brought by a proposed sub-class referred to in the complaint as "the National Consumer Fraud Class." This sub-class is defined as "All persons or entities that

purchased MetLife proprietary term life insurance where Met failed to comply with the provisions of N.Y. Gen. Bus. Law § 349 ... from January 1, 1998 through the present." To the extent count three alleges violation of the laws of states other than New York (including Oklahoma and Missouri, the states of residence of the plaintiffs), these state law claims are brought by a proposed sub-class referred to as "the State-Law Class." This sub-class is defined as "All persons or entities that purchased MetLife term life insurance products in one of the 'Affected States'... from January 1, 1998 through the present." (SAC ¶15.)

Count Four alleges violation of § 1214 of the Oklahoma Insurance Code, 36 O.S. 2001 §1214(3), with respect to the sale of term life insurance products. In this count, plaintiffs seek damages in an amount to be proven at trial. (SAC ¶ 119.) The Oklahoma Insurance Code claims are brought by members of the proposed State-Law Class who are also residents of Oklahoma (SAC ¶ 116) and who purchased MetLife term life insurance products from January 1, 1998 through the present. (SAC ¶ 15.) (Based on the allegations, of the three named plaintiffs, only plaintiff Thomas meets both of these criteria.)

As indicated above, the 10(b) claims (count one) depend upon the purchase of MetLife's mutual funds. The IAA claims (count two) depend upon the purchase of MetLife's mutual funds, financial plans, insurance products or annuities. The state law claims (counts three and four) depend upon the purchase of MetLife's term life insurance products. Otherwise, all claims arise out of much the same set of facts. Drawing on plaintiffs' own summary of those facts, plaintiffs contend that, as clients of MetLife, they were entitled to receive from MetLife advice free from any material conflict of interest; that MetLife ignored this obligation and intentionally withheld information about MetLife's material conflicts of interest; that, for example, MetLife failed to disclose that in order to remain employed at MetLife, MetLife's sales force was required to meet minimum production quotas with respect to sales of MetLife's

proprietary products; and that the federal and state laws upon which plaintiffs rely require MetLife to disclose this information.  As a result of this alleged wrongful conduct, plaintiffs seek rescission of their contracts with MetLife and return of fees paid to MetLife for financial services.

## II.  Standards

Until recently, dismissal under Rule 12(b)(6) was appropriate only where it appeared beyond a doubt that a plaintiff can prove no set of facts in support of his claim which would entitle him to relief.  Conley v. Gibson, 355 U.S. 41, 45-46 (1957).  In Bell Atlantic Corp. v. Twombly, 127 S.Ct. 1955 (2007), however, the Supreme Court prescribed a new inquiry  to use in reviewing a dismissal; that inquiry is whether the claim contains enough facts to state a claim to relief that is plausible on its face.  Ridge at Red Hawk, L.L.C. v. Schneider, ___ F.3d ___, 2007 WL 1969681 at * 3 (10th Cir., 2007), quoting Bell Atlantic Corp., 127 S.Ct. at 1974.  In order to survive a  motion to dismiss, a plaintiff must nudge his claim across the line from conceivable to plausible.  Ridge at Red Hawk, L.L.C., 2007 WL 1969681 at *3, quoting Bell Atlantic Corp., 127 S.Ct. at 1974.  The court, in conducting its review, still assumes the truth of the plaintiff's well-pleaded factual allegations and views them in the light most favorable to the plaintiff.  Ridge at Red Hawk, L.L.C., 2007 WL 1969681 at *3.

To the extent that Rule 12(b)(1) standards apply, the court notes that in passing on a motion to dismiss, whether the motion brings a facial attack on the ground of lack of jurisdiction over the subject matter under Rule 12(b)(1), or challenges the complaint for failure to state a cause of action under Rule 12(b)(6), the non-movant enjoys similar safeguards; the allegations of the complaint should be construed favorably to the pleader and the court will not look beyond the face of the complaint to determine jurisdiction.  See, e.g., Sea Vessel, Inc. v. Reyes, 23 F.3d 345, 347 (11th Cir. 1994) (non-moving party receives the same protection with respect to 12(b)(1)

as it would defending against a motion brought under Rule 12(b)(6), quoting <u>Osborn v. United States</u>, 918 F.2d 724, 729 n.6 (8th Cir. 1990)); 2 <u>Moore's Federal Practice</u>, § 12.30[4] (Matthew Bender 3d ed.) *Cf.,* <u>Pringle v. United States</u>, 208 F.3d 1220, 1222-23 (10th Cir. 2000)("When reviewing a factual attack [as opposed to a facial attack] on subject matter jurisdiction, a district court may not presume the truthfulness of the complaint's factual allegations...[and] has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1). In such instances, a court's references to evidence outside the pleadings do[] not convert the motion to a Rule 56 motion.").

MetLife has submitted a number of documents in support of its motion. These documents are not attached to the complaint, and they are not referred to in the complaint. MetLife asks the court to take judicial notice of these documents for purposes of the motion to dismiss. Plaintiffs object to consideration of these documents at this stage, arguing that Rule 12(b) requires the court to convert the motion to one for summary judgment if matters outside the pleadings are presented (and not excluded) in support of a 12(b)(6) dismissal. Rule 12(b), Fed. R. Civ. P. In response to MetLife's motion and documentation, plaintiffs also submit their own documents which are not attached to the complaint or referred to in the complaint.

In submitting documents outside the pleadings, MetLife relies on a narrow exception to the general rule of conversion, and argues that this exception allows the court to consider documents outside the pleadings without converting the motion, so long as the documents are central to the complaint and there is no dispute regarding the documents' identification or authenticity. This exception, however, only applies to documents that are referenced in a complaint. <u>Alvarado v. KOB-TV, L.L.C.</u>, 493 F.3d 1210, 1215-16 (10th Cir. 2007); <u>Jacobsen v. Deseret Book Co.</u>, 287 F.3d 936, 941 (10th Cir. 2002). The documents attached to MetLife's motion are not referenced in the complaint, and so the exception does not apply. Thus, the court must either

convert the motion, or not consider the documents.  No party has asked the court to convert the motion, and the court would decline to do so in any event.  For these reasons, the court does not consider the extraneous documents submitted by the parties with their moving papers.[3]

### III.  Discussion

MetLife argues that "plaintiffs lack standing to assert any claims (federal or state) based on securities and insurance products they did not purchase[4] or under laws of states other than their own."[5]  (Moving brief, doc. no. 98, p. 4.)  Thus, the motion to dismiss clearly challenges plaintiffs' standing to bring both their federal and state claims.[6]  The motion to dismiss makes additional arguments which go beyond standing issues and reach the merits of plaintiffs' claims.  The discussion portion of this order first addresses some general matters pertaining to standing; next, it addresses the federal claims, with federal standing issues addressed before merits-based issues; the court then addresses the state law claims, again, with standing issues addressed before merits-based issues.

### A.  General Matters Pertaining to Standing

No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal court jurisdiction to actual cases or controversies.  Simon v. Eastern Kentucky Welfare Rights Organization, 426

---

[3]The court's decision not to consider documents outside the pleadings moots the issues raised in MetLife's objections to plaintiff's exhibits 31-35.  (Doc. no. 113.)

[4]This argument is the basis of MetLife's standing challenges to the federal claims.

[5]This argument is the basis of MetLife's standing challenges to the state law claims.

[6]In certain cases, count three alleges violations of more than one statute or act of the same state.  Some of these state laws are described in the complaint as anti-trust laws, consumer fraud acts, consumer protections acts, or business laws.  This order refers to these state laws, collectively, as "consumer fraud acts and deceptive trade practices acts," because this description is used in the complaint. (SAC ¶ 112, introductory paragraph.)

U.S. 26, 37 (1976).  As applied in this case, at this stage, this standing requirement means that each plaintiff must have alleged a personal stake in the outcome of the controversy so as to warrant invocation of federal court jurisdiction and justify exercise of the court's remedial powers on that plaintiff's behalf.  *Id*. at 38.

Despite the filing of three versions of the complaint over the past year, the allegations pertaining to plaintiffs' standing to bring this action on behalf of the various sub-classes remain vague.  Paragraph 11 of the complaint, which appears under the heading "parties," is apparently intended to allege standing facts pertinent to all claims.  Paragraph 11 alleges, in its entirety, as follows.

> During the time period between January 1998 to the present (the "Class Period"), Plaintiff Thomas, an individual resident of this District, purchased units of MetLife Proprietary Products, including both mutual funds and term life insurance, and was damaged thereby; Plaintiff Ising, a resident of the State of Missouri, purchased units of MetLife Proprietary Products, including both mutual funds and term life insurance, and was damaged thereby; and Plaintiff Stout, an individual resident of this District, purchased a financial plan from MetLife, and was damaged thereby.

*See also*, SAC ¶ 88 (conclusory allegations that "Plaintiffs relied upon the Defendant's omissions of material fact and such reliance caused Plaintiffs to enter into transactions that resulted in financial loss....").

### B.  Standing to Bring Federal Claims

### 1.  Federal Claims Based on Purchases of MetLife's Proprietary Mutual Funds

MetLife argues that there are no allegations that plaintiffs purchased MetLife's proprietary mutual funds during the time period put in question by the complaint. (Doc. no. 98, pp. 9-11.)  *See generally*, Salomon Smith Barney Mut. Fund Fees Litig., 441 F.Supp.2d 579, 607 (S.D.N.Y. 2006) ("With regard to the sixty-eight funds of which Plaintiffs own no shares, Plaintiffs do not have standing to assert any claims

because Plaintiffs cannot satisfy the standing requirements.") This standing argument challenges the viability of any federal claims based on the purchase of proprietary mutual funds, that is, it challenges all of plaintiffs' 10(b) claims and the portion of plaintiffs' IAA claims that is based on the purchase of mutual funds (as opposed to other products).[7] In short, this particular standing argument challenges all claims alleged in count one and some of the claims alleged in count two.[8]

Paragraph 11 of the complaint, quoted above, alleges purchases of proprietary mutual funds by plaintiffs Thomas and Ising; it alleges no purchase of proprietary mutual funds by plaintiff Stout. Thus, no facts are alleged in support of plaintiff Stout's standing to bring any claims based on the sale of MetLife's proprietary mutual funds. Accordingly, absent amendment following discovery (see part "B," below), count one and the funds-based portion of count two should be dismissed for lack of standing, to the extent those claims purport to be brought by plaintiff Stout.

Even as to plaintiffs Thomas and Ising, ¶ 11 only alleges purchases of MetLife proprietary mutual funds between the dates of January 1998 and the present. However, the sub-classes upon whose behalf plaintiffs propose to bring the federal securities claims and the funds-based portion of the IAA claims, consist of all persons or entities who purchased proprietary mutual funds from January 31, 2002 through the present. (SAC ¶ 15.) Under these pleadings, it is entirely possible that the only MetLife proprietary mutual funds purchased by the plaintiffs were purchased after

---

[7]The moving brief does not include a separate heading challenging IAA claims for lack of standing based on the argument that plaintiffs are not alleged to have purchased the funds in question during the class period pertaining to the IAA claims. However, that argument is made in the motion. For example, MetLife's moving brief states that plaintiff Ising "lacks standing to sue MSI under the Exchange Act or IAA because she never purchased any securities...from MSI during the class period." (Doc. no. 98, p. 10.)

[8]This particular standing argument does not challenge plaintiffs' state law claims because the state law claims are based on the purchase of term life insurance and not on the sale of mutual funds. SAC ¶¶ 15, 112, 115, 118.

January of 1998 but before January 31, 2002; thus, it is equally possible that, under these pleadings, none of the named plaintiffs purchased any MetLife proprietary mutual funds within the class period relevant to the funds-based portion of either set of federal claims.

Separate and apart from ¶ 11, the allegations presented under the headings which expressly pertain to the federal claims do little to clarify plaintiffs' standing to allege those claims.  For example, with respect to count one, the securities claims, ¶ 93 alleges that "During the Class Period, Defendants omitted material information in their investment advice concerning the sale of MetLife's proprietary mutual funds." Paragraph  95 then alleges that: "Plaintiffs have standing to bring this cause of action and suit for damages under Rule 10b-5, because they bought MetLife products due to Defendants' fraudulent conduct."  These allegations say nothing about whether any of the named plaintiffs purchased MetLife funds during the period relevant to the PSLRA sub-class, that is, between January 31, 2002 and the present.  Similarly, ¶ 96 alleges that "Plaintiffs...purchased MetLife proprietary mutual funds" but it does not link any one of the three plaintiffs to a single purchase of MetLife mutual funds during the class period that pertains to the securities claims.  The same is true of ¶ 99, which alleges damages under count one but does not allege that any of the plaintiffs paid any commissions or were otherwise damaged, during the relevant class period.

### 2.  Federal Claims Based on Purchases of Other MetLife Proprietary Products

In addition to the purchase of MetLife's proprietary mutual funds, the IAA claims also involve purchases of MetLife's proprietary financial plans, insurance products and annuities.  The allegations are just as vague with regard to the dates of purchase of these categories of proprietary products as they are with respect to the funds-based claims discussed above.  For example, the IAA claims are alleged in count two, yet count two includes no allegations that specifically reference plaintiffs'

standing.  The only allegations in count two that even arguably touch on plaintiffs'
standing are found in ¶110.  Paragraph 110 alleges that:  "As a direct and proximate
result of MetLife's multiple breaches of their fiduciary duties owed to Plaintiffs and
the Class, Plaintiffs and the Class were damaged and are entitled to rescind their
investment advisory contracts and recover all fees paid in connection with such
contracts."  There are no other references to "investment advisory contracts" *per se*
in the complaint,[9] and there are no allegations that any of the three named plaintiffs
entered into any investment advisory contracts with MetLife, or paid fees in
connection with such contracts, between January 31, 2002 and the present -- the class
period relevant to the IAA claims.

3.  Findings Regarding Standing
to Allege 10(b) and IAA Claims

It is fundamental that in order to adequately allege and ultimately prove facts
supporting a plaintiff's standing to bring federal claims based on the purchase of
MetLife's mutual funds and other proprietary products, a plaintiff must have
purchased such products during the time period relevant to the proposed sub-class on
whose behalf that plaintiff seeks to litigate.  *See generally*, Salomon Smith Barney
Mut. Fund Fees Litig., 441 F. Supp. 2d at 607 ("With regard to the sixty-eight funds
of which Plaintiffs own no shares, Plaintiffs do not have standing to assert any claims
because Plaintiffs cannot satisfy the standing requirements"); Simon v. Eastern Ky.
Welfare Rights Org., 426 U.S. at 38 ("when a plaintiff's standing is brought into issue
the relevant inquiry is whether, assuming justiciability of the claim, the plaintiff has
shown an injury to himself that is likely to be redressed by a favorable decision").

The fact that this case is ostensibly brought as a class action changes nothing
in that regard.  *See generally*, Griffin v. Dugger, 823 F.2d 1476, 1483 (11th Cir. 1987)

---

[9]There are, however, allegations referring to MetLife in its capacity as an "investment
advisor."  *See*, *e.g.*, SAC ¶¶ 103-09.

-11-

(plaintiff in Title VII employment discrimination class action case "cannot include class action allegations in a complaint and expect to be relieved of personally meeting the requirements of constitutional standing, even if the persons described in the class definition would have standing themselves to sue"); In re Eaton Vance Corp. Sec. Litig., 219 F.R.D. 38, 41 (D. Mass. 2003) (claims of plaintiffs who had never purchased shares in or conducted any other business with two of the four mutual funds in question were dismissed for lack of standing; "That a suit may be a class action...adds nothing to the question of standing, for even named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.").

Moreover, with respect to the 10(b) claims, the court is required to dismiss claims if the materiality of the omission to the loss suffered by the plaintiff is not adequately alleged. *See*, 15 U.S.C. § 78u-4(b)(1)(A), (B) (allegations are required regarding the making of an untrue statement of a material fact or the omission of a statement of material facts); § 78u-4(b)(3)(A) (dismissal is required if the materiality requirements of §78u-4(b)(1) are not adequately alleged); and § 78u-4(b)(4) (requiring plaintiff to prove the act or omission caused the loss for which the plaintiff seeks to recover damages). By failing to link plaintiffs' purchases and resulting damages to the class period in question, plaintiffs have failed to meet the materiality requirements that apply to their securities claims.

In sum, with respect to their federal claims, none of the plaintiffs have alleged what, if any, MetLife proprietary products any one of them purchased during the relevant class period, which is January 31, 2002 through the present. Given the complexity of this action and the jurisdictional nature of standing, the court concludes that, absent amendment following discovery (see part "B," below), both sets of federal

claims (counts one and two), as alleged by all three plaintiffs, should be dismissed for failure to allege facts in support of standing.

## C. Particularized Discovery

A discovery stay is currently in place under 15 U.S.C. § 78u-4(b)(3)(B).  As stated in that statute:  "All discovery...shall be stayed during the pendency of any motion to dismiss, unless the court finds upon the motion of any party that particularized discovery is necessary to...prevent undue prejudice to that party."  Thus, on motion of a party, the court may partially lift the discovery stay when  necessary to prevent undue prejudice.

In their response brief, plaintiffs request discovery for the purpose of establishing when they  purchased the products that are the subject of the securities claims and the IAA claims.  (Doc. no. 105, p. 26.)  This request satisfies the requirement that a stay may be lifted "on motion of a party."

With regard to the statute's "undue prejudice" requirement, the court notes MetLife's position that no discovery should be necessary to determine the standing facts in issue here, because plaintiffs should know what funds or other proprietary products they purchased and when they purchased them.  This case, however, presents a complex matrix of claims:  there are two different types of federal claims, different types of MetLife proprietary products are in issue with respect to each set of federal claims; and the types of MetLife proprietary products purchased by the plaintiffs varies (plaintiff Stout, for example, not being alleged to have purchased any products other than term life insurance).  In these circumstances, it is understandable that plaintiffs may need some particularized discovery to help them determine exactly which plaintiffs purchased exactly which MetLife proprietary products during the time period relevant to the federal claims.

Also, the requested discovery is necessary to prevent undue prejudice.  Absent particularized discovery on this subject, the federal claims are subject to dismissal for lack of facts alleged in support of standing.

For all of these reasons, the court rejects MetLife's position that no discovery should be allowed on this subject.  The discovery stay will be lifted for ninety days for the limited purpose of allowing the parties to discover evidence relevant to the following question:

> Which, if any, MetLife proprietary products as defined in the complaint and as put in issue by either of the federal claims (mutual funds with respect to the 10(b) claims; and financial plans, mutual funds, insurance products and annuities with respect to the IAA claims);
>
> were purchased by which, if any, of the three named plaintiffs;
>
> during the time period relevant to the federal claims, which, for both of the proposed federal sub-classes (the National PSLRA Class and the National IAA Class) is the period from January 31, 2002 through the present.

As to all other matters, the discovery stay remains in place.[10]

## D.  Other Arguments
### In Support of Dismissal of the Federal Claims

Until it is determined whether any of the three named plaintiffs have standing to allege their federal claims, most of the substantive issues raised by MetLife's motion to dismiss the federal claims will be held in abeyance.  Specifically, the court abates any ruling on whether, as a matter of law, the federal securities laws require the disclosures put in issue by this action; whether, under the federal securities laws, plaintiffs may recover their fees paid to MetLife (briefed by MetLife as an aspect of

---

[10]The court realizes that the permitted discovery may relate to some of MetLife's other defenses (such as defenses that claims are time-barred), but that is not the purpose for which the discovery is allowed.

its argument that plaintiffs have not adequately alleged loss causation)[11]; and the question of whether there is a private cause of action under the IAA.

Although the court would ordinarily defer all other 12(b)(6) arguments for dismissal of the federal claims until the plaintiffs' standing to bring those claims is determined, it is beneficial for the court to reach, in a very limited way, certain other arguments offered by MetLife in support of dismissal of the federal claims. These arguments are addressed at this point only because they do not directly involve the merits of the federal claims. Accordingly, the court makes the following rulings.

With respect to MetLife's arguments that plaintiffs' claims are time-barred, the court finds that these arguments rely on matters outside the pleadings. The same is true of MetLife's argument that the IAA claims should be dismissed because the allegations show there are no investment advisor contracts as a matter of law. The IAA allegations are adequate for present purposes; in saying so, the court in no way reaches the question of whether the types of agreements which may ultimately be shown to be in issue in this case are actionable under the IAA. These arguments are rejected as grounds for dismissal at this stage.

MetLife also urges the court to dismiss certain claims for lack of specificity with regard to the type of conduct alleged to be wrongful. For example, MetLife asks the court: to dismiss all claims, including but not limited to the IAA claims, because they are fraud claims subject to the pleading requirements of Rule 9(b), Fed. R. Civ. P.; to dismiss the securities claims because they do not meet heightened pleading requirements under the PSLRA; to dismiss the IAA claims because they depend on

---

[11]Other aspects of MetLife's loss causation arguments are rejected as grounds for dismissal at this stage. Some of these issues are moot in light of plaintiffs' statements that they do not sue for share price damages. To the extent MetLife argues plaintiffs have not adequately alleged a causal connection between the value of the fees paid and the material omissions, the court rejects this argument. The complaint adequately alleges that plaintiffs paid fees for objective financial advice, which plaintiffs did not receive, resulting in damages to each of the plaintiffs in the amount of the fees paid by him or her.

the existence of investment advisor accounts as to which the complaint is vague; and to dismiss all claims that require allegations of scienter because there are no allegations which, if proven, would show that MetLife knew the challenged conduct to be wrongful. The complaint (a 51-page, 119-paragraph document with 30 exhibits attached) adequately sets out the nature of the conduct alleged to be fraudulent or otherwise wrongful, in sufficient detail so as to meet any arguably applicable pleading requirements that might pertain to the federal claims. The court declines to dismiss the federal claims on any of the above-stated grounds.

### E.  Standing to Allege State Law Claims

The court now turns to MetLife's challenges to plaintiffs' state law claims, which, as previously stated, allege violations of various laws of 42 states, including Oklahoma, in counts three and four of the complaint. Before addressing MetLife's standing challenges to these state law claims, the court makes two observations which narrow the set of state law claims remaining in issue.

First, plaintiffs concede MetLife's argument that the alleged Missouri violations fail to state a claim because the Missouri statute contains a specific exemption from liability for insurance companies. (Doc. no. 105, p. 36, n. 19.) The court concurs with the parties that the alleged Missouri violations fail to state a claim. Accordingly, all claims alleged under the laws of Missouri (whether alleged by plaintiff Ising as a resident of Missouri, or by plaintiffs Thomas or Stout) should be dismissed with prejudice under Rule 12(b)(6). Leave to amend the Missouri claims would be futile.

Second, as previously noted, plaintiff Stout is not alleged to have purchased any MetLife proprietary products other than "a financial plan." (SAC ¶ 11.) All of the plaintiffs' state law claims arise out of the purchase of term life insurance products.

(SAC ¶ 15, 112, 118).[12]  Thus, no facts are alleged in support of plaintiff Stout's standing to bring any state law claims, and, absent amendment, all state law claims alleged by plaintiff Stout should be dismissed for lack of standing.

As a result of the above two rulings, MetLife's standing challenges remain to be addressed only with respect to plaintiff Thomas's and plaintiff Ising's ability to bring claims under the laws of the 41 states still in issue (the 42 states referenced in the complaint, minus Missouri).  In that regard, MetLife contends a plaintiff cannot bring claims under the consumer fraud and deceptive trade practices acts of the laws of any state other than his or her own.  (Doc. no. 98, p. 4.)

Plaintiffs respond to MetLife's state law standing arguments by clarifying that they do not contend an Oklahoma resident may sue under Georgia law.  Rather, plaintiffs contend that they are bringing a class claim on behalf of Georgians, for example, under Georgia law.  (Doc. no. 105, p. 36.)  By making this argument, plaintiffs essentially confess that the complaint, as it now stands, does not allege any connection between the named plaintiffs and the laws of any states other than each of the named plaintiff's particular state of residency.

Plaintiffs also argue that MetLife has "coined" its arguments as both "standing" arguments and as "choice of law" arguments, but that, either way, "Met is wrong."[13] (Doc. no. 105, p. 36.)  Plaintiffs' brief then discusses the view that class certification issues may, at times, be logically antecedent to Article III concerns.  (Doc. no. 105, pp. 36-37.)  On that basis, plaintiffs ask the court to defer ruling on their standing to allege state law claims until after class certification.  The cases plaintiffs cite in

---

[12]Count 4 also refers to purchases of life insurance policies or annuity contracts. (SAC ¶116.)

[13]MetLife argues that under a choice of law analysis, only Oklahoma and Missouri laws apply to the state law claims.  These choice of law argument rely on evidence outside the pleadings. The court rejects MetLife's choice of law arguments as the basis for dismissal of any claims at this stage.

support of deferral are inapposite, however.  Both <u>Ortiz v. Fibreboard Corp</u>., 527 U.S. 815 (1999), and <u>Amchen Products, Inc. v. Windsor</u>, 521 U.S. 591 (1997), involved the courts' ability to reach global mass settlements of claims brought against manufacturers of products alleged to contain asbestos.  On the other hand, in securities cases, courts have rejected arguments for deferral of standing issues.  In <u>Salomon Smith Barney Mutual Fund Fees Litigation</u>, 441 F.Supp.2d 579, 606 (S.D.N.Y. 2002), for example, the court noted the traditional aversion to creating broad exceptions to the requirements of jurisdiction, the unique factual history of the asbestos tort cases (such as <u>Ortiz</u> and <u>Amchen</u>) relied upon by the plaintiffs in that case, the practical realities of the case before the <u>Salomon</u> court, and the important principles underlying Article III.  *Id*. at 606-07.  The court also recognized that in securities cases, standing requirements have been considered an important curb to the risk of vexatious litigation and discovery abuse.  *Id*. at 606, n.25.  Based on these considerations, <u>Salomon</u> rejected plaintiffs' request to delay determination of standing until after class certification.  *See*, *id*. at 579, n.29.

The <u>Salomon</u> reasoning applies here.  Although securities are not the subject of plaintiffs' state law claims, plaintiffs' purchases of the insurance products which are the subject of their state law claims have much more in common with the securities purchases in <u>Salomon</u> than with the injuries based on asbestos exposure which were involved in <u>Ortiz</u> and <u>Amchen</u>.  Another practical consideration in this case is that the state claims are brought under various laws of 41 different states.  Each law referenced in the complaint presumably has different elements, is encrusted with a unique body of case law, and has its own policy goals.  Without pre-judging the question of class certification in any way, the court simply notes the obvious:  in any single action, it would be difficult for any single court to adjudicate claims under various statutes of 41 different states.

Plaintiffs have not persuaded the court that traditional rules requiring determination of Article III standing issues before class certification issues should not be followed here. Thus, the court rejects plaintiffs' position that determination of standing to bring the state law claims should be deferred until after class certification.[14] Accordingly, the court now addresses the adequacy of the complaint to allege facts in support of plaintiff Thomas's and plaintiff Ising's standing (the only plaintiffs who allegedly purchased insurance products) to bring claims for violation of the 41 states whose laws remain in issue.

As plaintiff Thomas is alleged to be a resident of Oklahoma during the time of the purchases of the products in question (SAC ¶ 11),[15] the complaint alleges a sufficient connection between (i) the transaction in which plaintiff Thomas was deceived and (ii) the State of Oklahoma. Thus, the complaint adequately alleges facts in support of plaintiff Thomas's standing to bring claims for violation of the Oklahoma laws in question (the Oklahoma Deceptive Trade Practices Act, the Oklahoma Consumer Protection Act, and the Oklahoma Insurance Code).

However, as for plaintiff Thomas's claims that the laws of the *other* 40 states whose laws remain in issue were violated by MetLife, causing him injury, there are no allegations linking his injuries to violation of these laws.[16] Absent amendment to

---

[14]It appears to the court that plaintiffs may request deferral based on <u>Ortiz</u> with respect to their state law claims only. (Doc. no. 105, pp. 36-37.) MetLife's reply brief (doc. no. 112, pp. 4-5), however, appears to interpret plaintiffs' request for deferral of standing issues as a request pertaining to all standing issues. The court finds no reason to defer ruling on standing until after class certification with respect to either type of claim, state or federal.

[15]The complaint does not actually allege that any of the three plaintiffs made the purchases which are the subject of this action while they were residents of their states of residence as identified in the complaint. *See*, SAC ¶ 11. This allegation is adequately implied, however, and MetLife has not made an issue of it. No amendment is required in this regard.

[16]Forty-two states' laws allegedly violated per the complaint, minus Missouri whose laws are no longer in issue, and minus Oakahoma where plaintiff Thomas is alleged to be a resident, leaves 40 states whose laws remain in issue with respect to plaintiff Thomas.

allege a sufficient connection between plaintiff Thomas and his claim that MetLife's violation of a particular state's consumer fraud or deceptive trade practices act resulted in specific damage to him, plaintiff Thomas's claims alleging violations of the laws of the 40 states where he is not alleged to be a resident, should be dismissed for lack of standing.

The same analysis applies to plaintiff Ising's standing to bring claims based on violation of the 41 states' whose laws remain in issue as to her.[17]  The complaint alleges no connection between plaintiff Ising's transactions and any injuries to her allegedly arising from MetLife's violation of the laws of 41 states where she is not alleged to be a resident.  Absent amendment, plaintiff Ising's claims for violation of the laws of these 41 states should be dismissed for lack of standing.

In short, the court's analysis requires dismissal of any state law claims alleged under the laws of any states where a particular named plaintiff is not a resident.  This dismissal includes all claims brought by plaintiffs Thomas and Ising (and plaintiff Stout, had he been alleged to have purchased life insurance products), for violation of New York Gen. Bus. Law § 349.  Thus, absent amendment, the New York claims are included among the state law claims dismissed for lack of standing.  Nevertheless, as the complaint describes a separate sub-class on whose behalf plaintiffs purport to bring the New York claims, and as the viability of the New York claims has been separately briefed, additional treatment of the New York claims is appropriate here.

The New York claims are alleged in count three on behalf of the National Consumer Fraud Class.  (SAC ¶ 15.)  In support of dismissal of the New York claims, MetLife relies on <u>Goshen v. Mutual Life Insurance Company of New York</u>, 98 N.Y.2d 314 (N.Y. 2002).  <u>Goshen</u> addresses the "territorial reach of General Business

---

[17]Forty-two states referenced in the complaint, minus Missouri whose laws are no longer in issue and where plaintiff Ising is also alleged to be a resident, leaves 41 states whose laws remain in issue with respect to plaintiff Ising.

Law § 349." *Id*. at 324.  In that case, the court concluded that "hatching a scheme," or "originating a marketing campaign in New York," was not conduct that gave rise to an actionable deceptive act or practice under the New York statute. *Id*.  The court stated that "the transaction in which the consumer is deceived must occur in New York." *Id*.

In response, plaintiffs cite Leider v. Ralfe, 387 F. Supp. 2d 283 (S.D.N.Y. 2005), which discusses Goshen and concludes that the transactions in which the consumers were deceived in Leider were adequately alleged to have occurred in New York. *Id.* at 294.  The primary defendant in Leider was the DeBeers diamond group. Plaintiffs alleged that DeBeers's agreements, and its other U.S. conduct, was undertaken and disseminated from New York; that DeBeers created advertisements in New York and disseminated those ads throughout the U.S.; that throughout the class period, DeBeers maintained a "1-800" phone number in New York with various employees or agents to answer and maintain the number; and finally, plaintiffs alleged they had purchased diamonds and diamond jewelry in New York City and had incurred damages there. *Id*.

Leider stated that Goshen "has resolved the geographic scope of N.Y. Gen. Bus. Law § 349 and [has] held that 'the transaction in which the consumer is deceived must occur in New York.'" Leider, 387 F.Supp.2d at 294.  In concluding that the plaintiffs in Leider had alleged a sufficient connection between the transaction in which the consumer was deceived and the State of New York, Leider relied on Mountz v. Global Vision Products, Inc., 770 N.Y.S.2d 603, 608 (2003).  Leider characterized Mountz as a case in which use of "a telemarketing site and even the receipt of Internet orders physically within New York State appear[ed] to form a New York locus for a transaction covered by the New York State consumer protection statutes." *Id*. at 294.

Here, there are no allegations regarding a telemarketing site in New York. There are no allegations that any of the plaintiffs' purchases of MetLife's proprietary

insurance products were physically made within the geographic territory of New York, or that internet orders were physically received within that state. There are no allegations that the transactions in question actually occurred in the State of New York. The only allegations which directly reference New York are contained in ¶ 12 of the complaint, where it is alleged simply that Metropolitan Life Insurance Company "is headquartered in New York, NY." The complaint goes on to allege that "Met[Life] created what it describes as a 'desired behavior' by implementing a compensation structure specifically designed to push the sale of proprietary products" (SAC ¶ 49); and that "Throughout the Class period, Met[Life] was aware, at both a corporate and branch office level, that its policies were leading to the sale of proprietary products," (SAC ¶ 61). Even presuming, as the court does, that plaintiffs could amend to allege that the above-described corporate conduct occurred within the physical boundaries of the State of New York, such allegations would still have much more in common with the types of claims rejected in Goshen as beyond the reach of the New York statute, than with the New York claims allowed to go forward in Leider.

Construing the compliant liberally, it alleges, or at least implies, a *slight* nexus between the wrongful conduct of MetLife and the State of New York. On balance, however, the complaint does not allege sufficient facts in support of standing to sue for a violation of N.Y. Gen. Bus. Law § 349, because no facts are alleged which bring MetLife's conduct within the  reach of that statute. Thus, in addition to the other, more general reasons already stated in this order, the New York claims should be dismissed for plaintiffs' failure to allege facts in support of standing to pursue claims for MetLife's wrongful acts under N.Y. Gen. Bus. Law § 349, as the reach of that statute is defined in Goshen and Leiden.

### F.  Merits-Based Challenges to the Oklahoma Claims

The only state law claims that remain in issue and which are not subject to dismissal for lack of standing are plaintiff Thomas's claims for violation of various Oklahoma statutes.  Accordingly, this order now addresses MetLife's merits-based arguments for dismissal of each of the three Oklahoma claims:  claims alleged under the Oklahoma Deceptive Trade Practices Act (count three); claims alleged under the Oklahoma Consumer Protection Act (count three), and claims alleged under the Oklahoma Insurance Code (count four).  The issue is whether plaintiff Thomas's claims for violation of any of these Oklahoma laws (or, in the alternative, any of the other two plaintiffs' claims, were this court to be incorrect regarding the other plaintiffs' lack of standing to allege the Oklahoma claims), should be dismissed under Rule 12(b)(6) for failure to state a claim.

### 1.  Oklahoma Deceptive Trade Practices Act.

MetLife argues there is no private cause of action for consumers under the Oklahoma Deceptive Trade Practices Act (ODTPA).  As stated in Conatzer v. American Mercury Insurance Company, Inc., 15 P.3d 1252, 1254 (Okla. Civ. App. 2000):  "It has been definitively established that [the Deceptive Trade Practices Acts] protect competing business interests and do not present a basis for suit by consumers."  See also, Bell v. Davidson, 597 P.2d 753 (Okla. 1979) (affirming attorney fees award to plaintiff as prevailing party in action by competing businesses under the ODTPA).  The complaint alleges wrongdoing to the plaintiffs by virtue of their status as purchasers, or consumers, of MetLife's proprietary products.  There are no allegations that plaintiffs are businesses in competition with MetLife as required under the ODTPA.  Based on the pleadings, it is obvious that even if amendment were allowed, plaintiffs could not allege that they are competitors of MetLife.  Accordingly, amendment would be futile, and plaintiffs' claims for violation of the ODTPA should be dismissed with prejudice for failure to state a claim.

## 2.  The Oklahoma Consumer Protection Act.

MetLife argues that the Oklahoma Consumer Protection Act (OCPA) claim should be dismissed because that Act exempts from its coverage:  "Actions or transactions regulated under laws administered by the Corporation Commission or any other regulatory body or officer acting under statutory authority of this state or the United States...."  15 O.S. 2001 § 754(2).  MetLife argues that under this exclusion from coverage, plaintiff Thomas's OCPA claims (and also plaintiffs Ising's and Stout's OCPA claims, were those claims not already disposed of by this order) should be dismissed because the subjects of those claims are transactions regulated by the Oklahoma Insurance Commissioner.

In response, plaintiffs cite <u>In Re General Motors Corp.</u>, 2005 WL 1924335 (W.D. Okla. 2005) for their view that the OCPA does not exempt the conduct in question.  <u>General Motors</u> stated that an OCPA claim should not be dismissed under the exemption as applied in that case, because the Oklahoma Department of Motor Vehicles did not regulate allegedly defective products such as the motor vehicles in issue.  *Id*. at *3.  That situation is entirely distinguishable from the situation presented here, however, in light of the broad enforcement and regulatory powers provided to the Oklahoma Insurance Commissioner to regulate the kinds of acts alleged as wrongful in this action.

For example, the Oklahoma Insurance Code gives the Oklahoma Insurance Commissioner broad powers to examine and investigate the affairs of every person engaged in the business of insurance in Oklahoma, in order to determine whether such person has been engaged in any unfair or deceptive act or practice prohibited by 36 O.S. 2001 § 1203.  Section 1203, in turn, provides that no person shall engage in Oklahoma in any trade practice defined in "this article" (Article 12 of Title 36, dealing with unfair practices and frauds), or determined pursuant to that article to be an unfair method of competition or an unfair or deceptive act or practice in the business of

insurance.  Section 1204 then lists a number of specific acts defined as unfair or deceptive acts or practices in the business of insurance, including making misrepresentations or disseminating false information.  36 O.S. 2001§ 1204.1.2.

The court concludes that General Motors is distinguishable, and that plaintiff Thomas's OCPA claims should be dismissed with prejudice for failure to state a claim under the exemption to the OCPA's coverage provided for in 15 O.S. 2001 § 754(2). Given the nature of the ruling, amendment would be futile.

### 3.  The Oklahoma Insurance Code Claim.

Plaintiff Thomas's claim under the Oklahoma Insurance Code, brought under 36 O.S. 2001 § 1214, is alleged in count four.  Although the Oklahoma Supreme Court does not appear to have addressed the availability of a private cause of action to enforce § 1214 in particular, MetLife argues that decisions involving other sections of the insurance code indicate there is no private cause of action under § 1214.  *See*, *e.g.*, Risk v. Allstate Life Insurance Co., 2006 WL 2021597 at *3-*4 (N. D. Okla. 2006) (36 O.S. 2001 §1220 does not create a private cause of action; the statute, on its face, does not create a private cause of action, citing Oklahoma Supreme Court cases and the three-prong test adopted in Holbert v. Echeverria, 744 P.2d 960 (Okla. 1987)).

MetLife is correct that there is nothing in the statute itself which expressly states whether a private cause of action is created.  Accordingly, plaintiff Thomas's Oklahoma Insurance Code claim is analyzed under the test articulated in Holbert v. Echeverria for determining whether a private right of action may be implied from a regulatory (public-law) state statute.  *See,* Holbert, 744 P.2d at 963 (three-prong test adapted from four-prong test applied to federal laws).[18]

---

[18]The court's holding in Holbert that the OCPA did not create a private cause of action has been superseded by a legislative enactment which expressly incorporated a private right of action in the statute, Walls v. American Tobacco Company, 11 P.3d 626, 628 (Okla. 2000).

The first prong of the test is whether plaintiff is one of the class "for whose especial benefit the statute was enacted." *Id.* In <u>Holbert</u>, the court determined that the OCPA did not meet this first criterion, reasoning that the Act was enacted for the benefit of the "consumer" and that every individual is a consumer in some respect. *Id.* Here, § 1214 of the Oklahoma Insurance Code states that it is "designed to protect citizens of the State of Oklahoma as purchasers and prospective purchasers of life insurance policies or annuity contracts against the use of sales methods which are misleading" because of certain conduct described in the statute.

This category of citizens for whom the statute was expressly designed – those with the prudence and foresight to make, or at least consider making, some provision for the financial benefit of their survivors or for their own financial security in retirement – is arguably enough smaller than the citizenry at large to qualify as a group for whose "especial benefit" the statute was enacted. This is certainly a smaller subset of the population than the "consumers" who were encompassed by the statute which was before the Court in <u>Holbert</u>. It is tempting to conclude that § 1214 does indeed satisfy the "especial benefit" requirement. Thus, the application of the first prong of <u>Holbert</u> to § 1214 does not lend itself to facile analysis. That issue need not be resolved in this order, however, because the court has concluded, as set forth below, that plaintiffs' § 1214 claim does not satisfy the second prong of the <u>Holbert</u> test.

The second prong of the test requires some indication of legislative intent, explicit or implicit, suggesting that the legislature wanted to create a private remedy and not to deny one. <u>Holbert</u>, 744 P.2d at 964. <u>Holbert</u> indicates the special importance of this second factor. *Id.* at 964 and n.12 (observing the second factor is one upon which [then] recent U. S. Supreme Court decisions placed special emphasis). Subsequent decisions addressing the Oklahoma test (as well as the now modified federal test from which that <u>Holbert</u> test was originally borrowed) place further

emphasis on considerations embodied in the second prong of the test.  *See*, *e.g.*, <u>Shero v. City of Grove, Oklahoma</u>, 2006 WL 3196270 at *9 and n.11 (N.D. Okla. 2006)("the central inquiry when determining if a statute implies a private right of action is legislative intent; recent U.S. Supreme Court decisions unequivocally state that when determining whether a federal statute implies a private right of action, the key inquiry is legislative intent); <u>Risk</u>, 2006 WL 2021597 at *3-*4 ("Even assuming that plaintiff is a member of a class that has a right to seek redress under the statute," a private right of action was rejected where plaintiff "failed to present persuasive arguments under the second and third prongs of <u>Holbert</u>").

In evaluating the second factor, the text of the act must be scrutinized for any implicit indication of intent to create or deny private redress.  <u>Holbert</u>, 744 P.2d at 964.  Legislative intent is ascertained by looking at the precise wording of the act and studying its history.  *Id*.[19]  Established rules of statutory construction are then applied to resolve any ambiguity.  *Id*.  When a statute grants enforcement authority to an administrative agency or officer, this grant implies the legislature did not intend to provide a private right of action.  <u>Risk</u>, 2006 WL 2021597 at *3, citing <u>Schmeling v. NORDAM</u>, 97 F.3d 1336, 1344 (10th Cir. 1996). In <u>Holbert</u>, it was relevant that another section of the OCPA authorized the Oklahoma Attorney General or a district attorney to bring an action.  Relying on this provision and the maxim *expressio unius est exclusio alterius*, the Oklahoma Supreme Court determined that the OCPA did not suggest a private right of action.  <u>Holbert</u>, 744 P.2d  at 965 ("The Act's failure to sanction invocation of redress by an aggrieved consumer serves to exclude any private right of action.")

---

[19]Neither party has identified any pertinent legislative history.  (There also was no pertinent legislative history in <u>Holbert</u>.  744 P.2d at 964.)

Similarly here, in 36 O.S. 2001 § 1205, the Oklahoma Insurance Code provides that the Insurance Commissioner "shall have power to examine and investigate into the affairs of every person engaged in the business of insurance in this state in order to determine whether such person has been or is engaged in any unfair method of competition or in any unfair or deceptive act or practice prohibited by Section 1203 of this article." Section 1203, in turn, broadly prohibits any trade practice which is defined in Article 12 (of the Insurance Code) or which is determined pursuant to Article 12 to be an unfair method of competition or an unfair or deceptive act or practice in the business of insurance.

Based on the above analysis, the court finds that the important second prong of the Holbert test is not satisfied.

The third prong of the test asks the court to consider whether implying a remedy for the plaintiffs would be consistent with the underlying purpose of the legislative scheme. *Id.* at 963. Plaintiffs argue that an implied private right of action is consistent with the statute's stated goals of protecting purchasers and prospective purchasers of insurance from sales methods which are misleading. MetLife, on the other hand, argues that allowing a private cause of action here would carve out certain deceptive trade practices from the commissioner's otherwise pervasive authority, contrary to the wide authority to investigate and redress deceptive trade practices given to the commissioner by the Act. For this reason, MetLife argues that implying a private remedy would be inconsistent with the underlying purpose of the legislative scheme embodied in 36 O.S. 2001 § 1214.

Both arguments are plausible, but neither is completely convincing. The best the court can say is that the third prong of the test does not strongly favor one side over the other. This stalemate is not problematic because Holbert and other courts' analysis of the Holbert test in later cases such as Shero and Risk, suggest the third factor is not determinative here given the importance placed on the second prong of

the test.  ***See, e.g.,*** <u>Holbert</u>, 744 P.2d 960, 965 ("Since under the first two factors of the...test the Act before us does not pass muster for creating an implied private right of action, there is no need to examine further.").

After careful consideration, the court finds and concludes that there is no private right to enforce 36 O.S. 2001 § 1214.  Accordingly, plaintiff Thomas's claim (and, in the alternative, the other plaintiffs' claims) for violation of § 1214 of the Oklahoma Insurance Code alleged in count four, should be dismissed with prejudice for failure to state a claim.  Given the basis of this ruling, leave to amend would be futile.

## IV.  Recap of Rulings

After careful consideration of the parties' submissions (excluding documents that go beyond the face of the complaint), the pleadings, and the relevant authorities, MetLife's motion to dismiss is **GRANTED IN PART**, **DENIED IN PART** and a ruling is **ABATED IN PART**.

In order to be as clear as possible about the status of all claims as addressed in this order, and about the court's intentions with respect to future proceedings, the court recaps its principal rulings and sets out certain procedural matters, as follows.

### 1.  Plaintiffs' Federal Claims

(Counts one and two)

The discovery stay is **LIFTED** for the limited purpose of permitting discovery by any named party, for ninety calendar days from the date of entry of this order, to discover which, if any, of the three named plaintiffs in this action, purchased, between January 31, 2002 and the present, any of the MetLife proprietary products put in issue by counts one or two of the complaint.  Within the ninety-day discovery period, or in

any event not later than the end of the ninety-day discovery period,[20] and informed by that discovery, the parties are **DIRECTED** to advise the court by a short notice, filed jointly if possible, regarding the process by which they propose the court should proceed to determine plaintiffs' standing to allege the federal claims.

If and when standing to allege a federal claim is determined to exist on the part of any one of the three named plaintiffs, the court will then address, based on the briefing already submitted if feasible, MetLife's Rule 12(b)(6) argument that the federal securities laws do not reach the type of conduct alleged in this action, as well as the other merits-based arguments which remain for determination with respect to whether either the securities claims, or the IAA claims, state a claim for which relief may be granted.  Accordingly, rulings on these merits-based federal issues are **HELD IN ABEYANCE**.

To the extent MetLife has presented other, non-merits-based arguments in support of dismissal of the federal claims, those arguments are rejected as a basis for dismissal at this stage for the reasons stated in this order.  To that extent, the motion is **DENIED**.

### 2.  Plaintiffs' State Law Claims

(Counts three and four)

<u>Missouri Claims</u>.  All claims brought by plaintiffs Thomas, Ising, and Stout, alleging violation of the laws of the State of Missouri are **DISMISSED** with prejudice under Rule 12(b)(6) for failure to state a claim.  Leave to amend would be futile.

<u>Claims by Plaintiff Stout.</u>  All of plaintiff Stout's state law claims are **DISMISSED**, with leave to amend, because the complaint does not allege that

---

[20] The court expects that the parties will cut to the chase on the limited discovery permitted during the ninety-day period.  The matters as to which discovery is permitted are well-defined; discovery squabbles will be unwelcome.

plaintiff Stout purchased any term life insurance products, the only products put in issue by any of the state law claims.

   State Law Claims for Violation of the Laws of States Other than Plaintiffs' States of Residence. Plaintiff Thomas's and Ising's state law claims that are alleged under the laws of states other than each plaintiff's own state of residence are **DISMISSED**, with leave to amend, for lack of standing, because the complaint does not allege any connection between the violation of these states' laws and these plaintiffs' damages. This ruling includes dismissal of claims for violation of New York Gen. Bus Law § 349, absent amendment, for the additional reason that the complaint fails to allege any facts to show that the allegedly wrongful purchases occurred within the reach of that statute.

   Claims for Violation of Oklahoma Laws. The only surviving claims alleging violation of Oklahoma laws are brought by plaintiff Thomas. Plaintiff Thomas's claims brought under the Oklahoma Deceptive Trade Practices Act, the Oklahoma Consumer Protection Act, and the Oklahoma Insurance Code , are each **DISMISSED** with prejudice under Rule 12(b)(6) for failure to state a claim. Leave to amend would be futile.

   Alternative Ruling on all State Law Claims. In the alternative, the court finds and concludes that all state law rulings stated in this order pertain equally to all three of the named plaintiffs, modified only as necessary to allow for each named plaintiff's particular state of residence.[21]

   Result. The result of the rulings on plaintiffs' state law claims is that all state law claims are **DISMISSED** in their entirety, some with prejudice (in the case of the

---

[21]For example, if another court were to find that plaintiff Ising or plaintiff Stout have standing to pursue the Oklahoma claims alleged in this action, then this court's ruling that plaintiff Thomas's Oklahoma claims fail under Rule 12(b)(6) would apply equally to plaintiff Ising's and plaintiff Stout's Oklahoma claims.

Missouri and the Oklahoma claims) and some without prejudice (in the case of dismissals solely on the ground of lack of standing).  To this extent, MetLife's motion to dismiss is **GRANTED**.  Leave to amend will be granted as set forth below.

Amendment of Certain State Law Claims.  If appropriate, one or more of the named plaintiffs may seek leave to amend any state law claims dismissed without prejudice, for the limited purpose of alleging facts in support of his or her standing to bring any such state law claim.[22]  Any motion to amend for this limited purpose shall be filed within thirty days of the date of this order.  Any such motion need not attach an entire proposed third amended petition, but must attach any new or modified language proposed by the plaintiffs to satisfy the deficiencies identified in this order, and the motion must clearly identify the proposed changes to the complaint.  MetLife is directed to respond to any such motion in the usual course.  If no leave to amend the state law claims is sought, or if no such amendment is ultimately allowed and effected, all state law claims will, at that point, be deemed **DISMISSED** for the reasons stated in this order.

Dated this 10th day of January, 2008.

_____

STEPHEN P. FRIOT
UNITED STATES DISTRICT JUDGE

07-0121p025(pub).wpd

---

[22]In other words, plaintiffs may not seek leave to amend with respect to the Missouri or Oklahoma claims because those claims have been dismissed for failure to state a claim under Rule 12(b)(6).