# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| ROBERT L. THOMAS and AMANDA THOMAS, Individually and on Behalf of All Others Similarly Situated,<br><br>    Plaintiffs,<br><br>vs.<br><br>METROPOLITAN LIFE INSURANCE COMPANY, and METLIFE SECURITIES, INC.,<br><br>    Defendants. | Case No. CIV-07-0121-F |

## ORDER

Defendants Metropolitan Life Insurance Company and MetLife Securities ("MetLife") have moved to dismiss the Third Amended Complaint (TAC, doc. no. 136) under Rule 12(b)(6), Fed. R. Civ. P., for failure to state a claim. (Doc. no. 144, filed June 16, 2008.) Plaintiffs have responded, and defendants have replied. Defendants' Request for Judicial Notice, filed August 1, 2008, is also before the court. (Doc. no. 157.) Plaintiffs did not respond separately to that filing, which is understandable because it is not styled as a motion. Plaintiffs' moving papers, however, make it clear that they object to the court considering the documents in question.

### I. Background

Based on prior rulings by the court and the fact that certain parties and claims have been dropped, Robert and Amanda Thomas now stand as the only remaining individually named plaintiffs in this action, and the only remaining claims are material

omissions claims brought by the Thomases under §§ 206 and 215 of the Investment Advisors Act of 1940 ("the IAA"), 15 U.S.C. § 80b-5. (TAC ¶ 1.) Although the TAC alleges that the Thomases bring this action individually and as a class action on behalf of all other persons similarly situated, no class issues have yet come before the court, and none are addressed in this order.

Briefly summarized, the TAC alleges that the IAA imposes fiduciary obligations on all persons who engage in the business of giving investment advice within the meaning of the IAA, for a fee, and that MetLife's financial sales representatives violated that fiduciary duty when they failed to disclose to clients such as the Thomases conflicts of interest created by MetLife's commission structures, fees, job-retention policies and other incentives which gave MetLife representatives a reason, in dealing with individuals such as the plaintiffs, to think first of their own financial interest in maximizing their sales of MetLife's proprietary products. Specifically, the TAC alleges that on July 1, 2003, the Thomases purchased one MetLife proprietary Flexible Premium Multifunded Life insurance policy on the advice of Metlife financial advisor Mr. Jeffrey Laxton, also referred to in the TAC as a MetLife financial sales representative.[1] Thus, based on Mr. Laxton's failure to disclose a conflict of interest to the Thomases at the time of their purchase, the TAC alleges that MetLife violated its fiduciary obligations owed to the Thomases under the IAA. The Thomases seek restitution of all commissions and fees allegedly paid by them to MetLife in exchange for the financial advice they received from Mr. Laxton.

---

[1] The TAC is ambiguous as to whether one or two policies were purchased by the Thomases. (TAC, ¶¶ 13, 14.) Defendants' brief states it is undisputed that only one policy was purchased by the Thomases. Plaintiffs' response brief does not take issue with that characterization. The court, therefore, presumes the TAC intends to allege the purchase of only one policy by the Thomases. If the TAC intends to allege that the Thomases purchased two policies, that fact would not change the results reached in this order.

The Thomases allege these commissions were included in the insurance premium they paid, and that the commissions were over and above the cost of the insurance.

MetLife seeks dismissal of all claims on a variety of grounds including two timeliness arguments.

## II.  Standards

The inquiry under Rule 12(b)(6) is whether the complaint contains enough facts to state a claim for relief that is plausible on its face.  Ridge at Red Hawk, L.L.C. v. Schneider, 493 F.3d 1174, 1177 (10th Cir., 2007), quoting Bell Atlantic Corp. v. Twombly, ___ U.S. ___, 127 S.Ct. 1955, 1969,1974 (2007).  To survive a motion to dismiss, a plaintiff must nudge his claims across the line from conceivable to plausible. *Id*.  The mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient;  the complaint must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims.  Ridge at Red Hawk, 493 F.3d at 1177.  In conducting its review, the court assumes the truth of the plaintiff's well-pleaded factual allegations and views them in the light most favorable to the plaintiff.  *Id*.

When a defendant seeks to have claims dismissed at the pleadings stage because claims are arguably time-barred, the defendant bears the burden of establishing that any periods of limitations or repose have run, and it is the court's task in ruling on the motion to merely assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support of the complaint.  Norman v. Salomon Smith Barney Inc., 350 F. Supp. 2d 382, 390 (S.D.N.Y. 2004) (IAA case), quoting Cooper v. Parsky, 140 F.3d 433, 440 (2d Cir. 1998).

## III. Discussion

### A. Timeliness

The IAA does not include its own limitations or repose provisions; rather, the IAA borrows its limitations and repose periods from the federal Securities Acts. Kahn v. Kohlberg, Kravis, Roberts & Co., 970 F.2d 1030, 1039 (2d Cir. 1992) (holding, pre-Sarbanes-Oxley, that "[t]he one/three year period used in the Securities Acts is the most appropriate [for IAA claims] since it reflects the accepted balancing of the same interests and is consistently applied to claims posing the similar factual and legal issues [as those posed by claims under the IAA]").[2] The time periods provided for in the Sarbanes-Oxley Act of 2002, however, extend certain limitations-type periods. In pertinent part, Sarbanes-Oxley provides that "a private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws, as defined in section 3(a)(47) of the Securities Exchange Act of 1934 (15 U.S.C. § 78c(a)(47)), may be brought not later than the earlier of...2 years after the discovery of the facts constituting the violation...or...5 years after such violation." 28 U.S.C. § 1658(b). Thus, where it applies, Sarbanes-Oxley extends the federal securities law's one-year limitations period to two years and its three-year repose period to five years.

The parties do not dispute these general principles. Their dispute arises over the initial question presented by MetLife's timeliness arguments, which is whether the extended periods of Sarbanes-Oxley apply to the Thomases' IAA claims alleged in this action. If Sarbanes-Oxley does not apply, then the Thomases are left with the unextended one- and three-year limitations and repose periods borrowed from federal

---

[2]Although not affecting the result or the rationale of that decision to the extent pertinent here, Kahn's use of the "hierarchical inquiry" test to determine which limitations period applies has been considered abrogated. Merine v. Prudential-Bache Utility Fund, Inc., 859 F. Supp. 715, 719 at n.2 (S.D. N.Y. 1994).

securities law. Accordingly, MetLife's first timeliness argument is that Sarbanes-Oxley does not apply and that this action, which was filed January 31, 2007, is time-barred, because the complaint was not filed within the three-year repose period which runs from the date the Thomases purchased the insurance policy, July 1, 2003. (Part 1, below.) If, on the other hand, plaintiffs have the benefit of Sarbanes-Oxley, the repose period is extended to five years from the date the Thomases purchased the insurance policy. In that event, this action is not barred under a statute of repose, but MetLife contends this action is nevertheless barred under the Sarbanes-Oxley two-year limitations period, based on inquiry notice, or constructive notice,[3] to the Thomases which MetLife argues resulted from certain SEC filings. This is MetLife's second argument for dismissal based on timeliness. (Part 2, below.)

1.

As stated, MetLife first contends that this action is barred by the applicable statute of repose because it was filed on January 31, 2007, more than three years after the Thomases purchased the life insurance policy in question on July 1, 2003. This argument depends upon the validity of MetLife's argument that the extended periods for filing suit provided for by Sarbanes-Oxley do not apply to the Thomases' breach of fiduciary duty claims because such IAA claims do not require proof of fraud. The Thomases disagree, arguing that the extended Sarbanes-Oxley limitations and repose periods apply to all IAA claims regardless of whether proof of fraud is required to support those claims. Additionally, the Thomases argue that Sarbanes-Oxley certainly applies to the Thomases' claims in this action because the Thomases' claims are supported with allegations of fraudulent conduct.

---

[3]MetLife uses these terms interchangeably (*see*, *e.g.*, doc. no. 144, pp. 10, 12-13) and the court does likewise.

The parties have not cited any determinative Tenth Circuit authority on the question of whether Sarbanes-Oxley applies to IAA claims, and rulings from other courts go both ways. Both sets of parties cite Kahn, however, an IAA case decided before the passage of Sarbanes-Oxley.

In Kahn, the Second Circuit adopted the federal Securities Acts, rejecting state laws and other federal laws as sources for IAA limitations and repose periods. *Id*. at 1030. As already noted, Kahn concluded that, "[T]he one/three year period used in the Securities Acts is the most appropriate [for IAA claims] since it reflects the accepted balancing of the same interests and is *consistently* applied to claims posing the *similar* factual and legal issues [as those posed by claims under the IAA]." *Id.* at 1039 (emphasis added). The plaintiffs in Kahn had argued that the one- and three-year periods of the federal securities laws should only apply to fraud-based securities claims, and not to plaintiffs' IAA claims which focused on the investment adviser's fiduciary duty and imposed a stricter standard of conduct. *Id*. at 1038. Kahn rejected the plaintiffs' arguments, siding with the defendants in that case, who argued that the limitations and repose periods from the federal Securities Acts should apply. As the above-quoted statement from Kahn reflects, the desire for consistency, and the similarity of purpose between the Securities Acts and the IAA, provided much of the rationale for borrowing the one- and three-year periods from the federal Securities Acts. This court agrees that consistency is important when determining limitations and repose periods for IAA claims.

This court is not persuaded by MetLife's district court authorities cited for the proposition that the limitations and repose periods of Sarbanes-Oxley do not apply to IAA claims because the IAA does not require proof of fraud. MetLife relies on Phoenix Four, Inc. v. Strategic Resources Corp., 2006 WL 399396, *6-8 (S.D.N.Y. 2006) and Kleinman v. Oak Associates, Ltd., 2007 WL 2071968, *2-3 (N.D. Ohio

2007).  Phoenix Four applied the pre-Sarbanes-Oxley one- and three-year periods based on the fact that Kahn applied those same periods, with no discussion of the fact that Sarbanes-Oxley had not been enacted when Kahn was decided, and with no discussion of the rationale applied in Kahn.  Phoenix Four at *7.  Kleinman, in turn, cites to Phoenix.  Kleinman at *2.  Ultimately, Kleinman seems to reason that because the Sixth Circuit previously agreed with the Second Circuit on related matters, Kleinman should apply the one- and three-year periods used by the Second Circuit in Kahn.  Kleinman at *3.  Although Kleinman notes that Kahn was decided pre-Sarbanes-Oxley, Kleinman does not discuss whether, had Kahn been decided after Sarbanes-Oxley, the Second Circuit would have applied the extensions of Sarbanes-Oxley to all IAA claims in the interest of consistency.  MetLife also relies on Norman v. Salomon, 350 F. Supp. 2d 382 at 391, for the proposition that IAA claims are not necessarily fraud claims, because the IAA's purpose is much broader, reflecting congressional intent to eliminate and expose conflicts of interest on the part of investment advisors.  In the portion of the Norman decision that addresses limitations issues, however, Norman notes the parties' agreement that the IAA claims were governed by the two- and five-year extended limitations and repose periods provided by Sarbanes-Oxley Act.  *Id*. at 390, n.2.  Aside from than this observation, the Norman court did not address the issue.

   Some courts have applied the expanded two- and five-year Sarbanes-Oxley periods to IAA claims, in varying circumstances, without discussion.  *See*, Broadhead Ltd. Partnership v. Goldman, Sachs & Co., 2007 WL 951623 at *6 (E.D. Tex. 2007) ("[T]he Sarbanes-Oxley Act requires a plaintiff to bring a claim for violation of the [IAA] within five years after the violation or two years after discovery of the violation, whichever is *earlier*.").  *And see*, Flood v. Makowski, 2004 WL 1908221 at *32 (M.D. Pa. 2004) ("[T]he IAA does not contain an express statute of limitations.

However, the Sarbanes-Oxley Act of 2002...created a statute of limitations applicable to the IAA."). Other courts have assumed, for purposes of discussion only, that Sarbanes-Oxley may apply to IAA claims. *See, e.g.*, Wuliger v. Anstaett, 363 F. Supp. 2d 917, 932-33 (N.D. Ohio 2005) ("Assuming *arguendo* that Sarbanes-Oxley applies to some of the Receiver's claims under the IAA, application of the two year state of limitations...still places this claim outside the applicable limitations period.").

Finally, although it may or may not be advisable to make the applicability of certain limitations or repose periods dependent upon the specific nature of the IAA claims alleged, fraudulent conduct is repeatedly alleged in this action in support of plaintiffs' breach of fiduciary theory of liability. For example, the TAC alleges: a "surreptitious scheme" (TAC, ¶ 8), that MetLife "intentionally withheld and omitted the truth of its scheme from its clients" (TAC, ¶51), and that MetLife "fraudulently failed to disclose to its clients its compensation structure...." (TAC, ¶ 64). The presence of such allegations is an additional factor suggesting that it is appropriate to apply the extended periods of Sarbanes-Oxley here, despite the fact that plaintiffs' IAA claims do not depend on proof of fraud.

The court concludes that the extended time periods of Sarbanes-Oxley apply to the Thomases' claims, extending the period within which suit could be commenced to the earlier of two years from the date of discovery of the conduct in issue or five years from the date of the Thomases' purchase of the insurance policy. MetLife's argument that the Securities' Acts unextended three-year statute of repose bars this action is rejected. The applicable period of repose is five years under Sarbanes-Oxley, and this action was brought within that five-year period.

2.

MetLife's second timeliness argument requires the court to consider documents outside the face of the pleadings. Plaintiffs object to the court's considering

documents outside the pleadings that are not referenced in the complaint. Plaintiffs remind the court of its previous admonition to defendants' counsel, cautioning vigilance regarding the differences between Rule 12(b)(6) motions and Rule 56 motions, and advising that filing a new motion to dismiss along with "a stack of documents" would result in the court either striking the motion or converting it while not allowing a later summary judgment motion. MetLife notes the court's admonition. MetLife then proposes four, short excerpts from SEC filings, all of which are public record, for the court's consideration.

Courts routinely consider public filings at the motion to dismiss stage. *See*, *e.g.*, In re Stac Electronics Securities Litigation, 89 F.3d 1399, 1405 n.4 (9th Cir. 1996) (district court's consideration of prospectus text, including portions not mentioned in the complaints, was appropriate at the motion to dismiss stage and did not convert the motion to one for summary judgment). There is nothing to be gained here from postponing consideration of the SEC-filings' impact on the viability of this action. Converting the motion would work a hardship on the parties, given the number of issues raised by the motion to dismiss; these issues, understood in their broadest terms, could suggest a raft of evidence that might be offered by either side for purposes of a converted summary judgment motion. Finally, it is not only defendants who have referred the court to SEC filings outside the pleadings. By incorporating certain pages of a brief filed by plaintiffs in response to a previous motion to dismiss, plaintiffs also refer the court to SEC filings not mentioned in the complaint.[4] In these circumstances, it is appropriate to consider the public SEC filings that have been

---

[4] Doc. no. 151, p. 22, n.14, incorporates pp. 21-26 of plaintiff's prior response brief, doc. no. 105, filed in opposition to defendants' motion to dismiss the second amended complaint, at p. 24, referencing and attaching ex. nos. 44, 45. Absent leave, incorporation by reference will not be allowed in future briefing. It is a practice that can be used to avoid page limitations, and it makes the moving papers less convenient for the court.

submitted, without converting the motion. These public records are not considered for the truth of the matters asserted within them.

MetLife's documents consist of SEC filings by MetLife (doc. nos. 157, ex nos. 1-4), including excerpts from a MetLife prospectus publicly filed with the SEC on April 30, 2004, proposed to be effective on May 1, 2004. (Doc. no. 157, ex. no. 1, referred to from this point forward as the May 1, 2004 document.) This document was filed approximately ten months after the alleged date of the Thomases' purchase of their insurance policy on July 1, 2003. MetLife argues that even under Sarbanes-Oxley, this action is time-barred because this May 1, 2004 document, which was publicly filed with the SEC more than two years before this action was filed on January 31, 2007, provided constructive notice to the Thomases of the MetLife commission and compensation structures challenged in this action.[5]

MetLife's constructive notice or inquiry notice cases are Securities Act cases, not IAA cases. There is a difference between invoking a prospectus filed with the SEC to constructively commence a limitations period in a 1933 or 1934 Securities Act case, and invoking a prospectus filed with the SEC ten months after an insurance purchase such as the Thomases' in order to put the Thomases on constructive notice of compensation policies which they allege should have been disclosed to them at the time of their purchase pursuant to MetLife's fiduciary obligations to its clients. Unlike a purchaser of stock, for example, an unsuspecting purchaser of a proprietary insurance product like the one purchased by the Thomases would have virtually no hope of seeing, and no obvious reason to seek out, information contained in a

---

[5]This May 1, 2004 SEC filing (doc. no. 157, ex. no. 1) includes a number of disclosures about the commission and compensation structures at issue in this action. MetLife also relies on an SEC filing, doc. no. 157, ex. no. 2. The filing date of this other SEC document shows it was filed with the SEC on April 29, 2003, with a proposed effective date of May 1, 2003. This other document does not include the disclosures regarding commission and compensations structures that are included in the May 1, 2004 filing.

prospectus filed with the SEC approximately ten months after his or her purchase. Nor would any such purchaser have reason to compare a prospectus on file months after the sales transaction with a prospectus on file at the time of the sales transaction, in order to conclude that certain disclosures contained in the later-filed prospectus were new but nevertheless applied at the time of the sale. Application of the constructive notice doctrine should have some connection to at least a hypothetical possibility that a plaintiff could actually be put on notice by the documents in question. MetLife's arguments do not support such a connection here.

The distinction between matters putting plaintiffs on notice in securities fraud actions and matters putting plaintiffs on notice of IAA claims, is noted in Norman, 350 F. Supp.2d 382 at 390-91. In that case, the proposed class of plaintiffs suing under the IAA consisted of consumers of a comprehensive portfolio management product offered by Saloman, in which Salomon made all investing decisions. *Id*. at 390-91. Plaintiffs alleged that they paid substantial fees in order to be relieved of the burden of managing their investments and monitoring financial information. *Id*. Distinguishing securities fraud claims, including fraud-on-the-market claims, from the IAA claims alleged in that case, Norman concluded it was "far from clear that such plaintiffs should appropriately be charged with knowledge of the news articles cited by Salomon." *Id*. at 391. Viewing the allegations in the light most favorable to plaintiffs, the court denied the motion to dismiss. *Id*. at 392.

MetLife has not cited any controlling or persuasive authority to support its contention that the SEC filings put the Thomases on constructive notice, or inquiry notice, of MetLife's policies so as to trigger the running of the two-year-from-discovery limitations period. MetLife's arid reasoning on this point is entirely unpersuasive. Accordingly, the court rejects MetLife's constructive notice argument for dismissal.

## B. Duty to Disclose Compensation Policies

MetLife next seeks dismissal by arguing that there is no statute or rule that requires disclosure of differential compensation, and that a majority of courts have refused to find a duty to disclose such information. Additionally, MetLife argues that if statutes, regulations and federal courts do not require disclosure of differential compensation, then failure to disclose such commission and compensation structures does not constitute a breach of fiduciary duty under the IAA. Plaintiffs respond by arguing that MetLife's cases are securities cases, not IAA cases. The court rejects MetLife's proposition that because the non-disclosures alleged in this action are not actionable under the 1933 and 1934 Securities Acts or under SEC regulations, these non-disclosures are not actionable under the IAA, an Act which "reflects a congressional recognition of the delicate fiduciary nature of an investment advisory relationship, as well as a congressional intent to eliminate, or at least to expose, all conflicts of interest which might incline [an] investment adviser--consciously or unconsciously--to render advice which was not disinterested." Securities and Exchange Commission v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 191-92 (1963).

Plaintiffs also point out that MetLife's arguments in this regard are limited to the issue of its representatives' compensation and do not address some of the other omissions plaintiffs allege, such as failure to advise that MetLife representatives would be terminated or forced to pay overhead costs for failing to meet sales quotas for proprietary products. (TAC ¶¶ 26, 27, 30, 31, allegations that financial sales representatives such as Mr. Laxton were required to push proprietary products over other products and to meet minimum sales quotas for these proprietary products, to avoid termination.) This is an accurate observation, and again, the court agrees with plaintiffs.

The court rejects MetLife's position that it is entitled to dismissal because it did not have a duty under the IAA to disclose its compensation policies.

### C. The Role of Financial Sales Representatives

MetLife next argues the TAC does not allege that MetLife financial advisors such as Mr. Laxton were investment advisers within the meaning of the IAA.

To the extent pertinent here, the IAA defines an "investment advisor" as "any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities; but does not include...any broker or dealer whose performance of such services is solely incidental to the conduct of his business as a broker or dealer and who receives no special compensation therefor...." 15 U.S.C. § 80b-2(11).

MetLife argues the TAC does not allege that Mr. Laxton provided the Thomases with investment advice, rather, the TAC only alleges that Mr. Laxton recommended the purchase of a specific MetLife product. The TAC alleges that the Thomases purchased the proprietary life insurance policy "upon the advice of MetLife financial advisor Jeffrey Laxton" (TAC, ¶¶ 13, 14). The TAC alleges that MetLife collected information from clients such as the Thomases' on "Asset Allocation Forms" which addressed clients' "risk score" and "time horizon score." (TAC, ¶ 58.) The TAC alleges that MetLife taught its advisors and agents "to push proprietary products over all other products" (TAC, ¶ 23), and that MetLife's incentive programs "ensure[d] recommendations of proprietary products." (TAC, ¶ 24.) These allegations are sufficient to allege that Mr. Laxton provided the Thomases with investment advice within the meaning of the IAA.

MetLife also argues that Mr. Laxton's recommendation to the Thomases was an isolated event, purely incidental to his job at MetLife, based on the fact that only one purchase of one variable life insurance product in July of 2003 is alleged. The allegation that Mr. Laxton sold the Thomases one policy may suggest that the purchase was an isolated event for the Thomases, but it does not necessarily suggest that the selling or advising was an isolated event on the part of Mr. Laxton or MetLife. To the contrary, the TAC alleges that MetLife advisors were required to push proprietary products and that advisors' continued employment was tied to their performance in this respect. The TAC sufficiently alleges that recommendations of the type purportedly made to the Thomases were not isolated events or merely an incidental part of Mr. Laxton's job or of MetLife's business.

MetLife also argues that Mr. Laxton is not alleged to have had discretionary authority over the Thomases' money, so that the IAA does not apply. The court rejects MetLife's contention that the IAA requires an investment advisor to exercise discretion over an advisees' funds. No such requirement appears on the face of the IAA, and MetLife has not persuaded the court that there is such a requirement.

MetLife also argues that Mr. Laxton comes within the exclusion contained in the IAA's statutory definition of "investment advisor" because there is no allegation that he received any special compensation in connection with the alleged financial advice he provided. MetLife argues that because the insurance premium the Thomases paid included the cost of the commissions and fees earned by Mr. Laxton as a result of his sale of the insurance policy to the Thomases, Mr. Laxton did not receive any special compensation for the investment advice he provided.

In response, plaintiffs point out the TAC alleges various types of compensation, including but not limited to expense allowance plan incentives received by financial sales representatives for rendering investment advice to clients. (TAC ¶ 34.)

Plaintiffs also cite United States v. Elliott, 62 F.3d 1304 (11th Cir. 1996).  In Elliott, the court found that although the defendants did not receive a separate investment adviser's fee, they did receive compensation for providing investment advice.  Id. at 1311. Elliott quotes an SEC Release stating that the compensation element is satisfied by receipt of "any economic benefit," and that, in order to meet the SEC's definition of compensation for investment advice, "[i]t is not necessary that a person who provides investment advisory and other services to a client charge a separate fee for the investment advisory portion of the total services." Id. at 1311, n.8.

The court concludes the TAC sufficiently alleges that Mr. Laxton received special compensation in connection with the sale of MetLife products to the Thomases.

The court rejects each of MetLife's proffered bases for arguing that the IAA does not apply given Mr. Laxton's role, or other financial sales representatives' role, in the events in question.

### D.  Failure to Plead Rescission

MetLife argues that plaintiffs' failure to explicitly seek rescission is fatal to this action.  MetLife cites Transamerica Mortgage Advisors, Inc. v. Lewis, 444 U.S. 11 (1979) for the proposition that "there exists a limited private remedy under the Investment Advisers Act of 1940 to void an investment advisers contract, but...the Act confers no other private causes of action, legal or equitable." Id. at 249.  MetLife argues that the IAA only allows rescission of a contract to receive financial advice, not rescission of the contract to purchase an insurance policy.  MetLife argues, therefore, that there is nothing to rescind here.  As rescission is the only remedy under the IAA, MetLife argues that plaintiffs cannot state a claim for relief under that Act. MetLife also argues that even if the Thomases could rescind the life insurance policy, they have not sought this remedy, the only remedy allowed to them.  Plaintiffs

respond by arguing that the fact that MetLife packages its investment advice and products in a single contract should not provide a safe harbor to MetLife. Plaintiffs also argue that the complaint is not deficient in that it seeks restitution of the fees and commissions paid by the Thomases, even though it does so without using the term "rescission."

MetLife's argument, if adopted, would allow a defendant to avoid liability under the IAA by combining compensation for investment advice with the price of the product being purchased pursuant to that advice into single transaction. Moreover, MetLife has not cited any persuasive authority for its view that, under the IAA, plaintiffs cannot seek return of only their payments for investment advice which they allegedly paid as part of their insurance premium. As stated in International Brotherhood of Painters and Allied Trades Union and Industry Pension Plan v. Duval, 1994 WL 903314, *4 (D.D.C. 1994), "[i]t is clear that the IAA would not permit plaintiffs to rescind the contract and recover any loss that the Plan sustained as a result of [defendant's] action or inaction. In such a case, plaintiffs would be limited to recovery of any consideration given under the contract." *Id*. at *4. The Thomases seek to recover only the consideration they allegedly gave for the investment advice they allegedly received. The Thomases do not claim any loss based on the value of the insurance policy they purchased. The court concludes that, in these circumstances, the TAC's failure, in terms, to seek "rescission" does not require dismissal of this action.

### E. Claims Based on Products that are Arguably Not Securities
### and
### The Thomases' Continued Assertion of Claims
### Based on Products They Are Not Alleged to Have Purchased

MetLife argues that some of the products upon which the Thomases' purported class claims are based are not securities, with the result that these products cannot be the basis of IAA claims. MetLife also argues that this action, or at least the overly-broad class action allegations claims, should be dismissed because, via those allegations, the Thomases continue to assert claims based on products they did not purchase, in violation of this court's prior order dismissing claims brought by plaintiffs who did not have standing because they had not purchased the products in question. Plaintiffs disagree, citing class certification cases rather than standing cases.

With regard to both arguments, MetLife appears to rely on what it considers to be the overly-broad product claims described in ¶ 18 of the TAC under the heading "The National IAA Class."[6] While it is true that the Thomases are not alleged to have purchased many of the products described in ¶18, if no class is ultimately certified, the class claims will be a nullity. Also, if the court were to certify a class but limit the class to those purchasing the same insurance product as was purchased by the Thomases, issues regarding the nature of various types of proprietary products described in ¶ 18 would be moot. Accordingly, Met-Life's arguments regarding how this court's rulings on standing affect the breadth of any class claims, and the nature of products put in issue by the class claims, and are best considered when class

---

[6]TAC, Part IV, ¶ 18 alleges: "Plaintiffs bring this action...on behalf of the following Class: ... All persons or entities who received investment advice and purchased proprietary investment products from MetLife, including financial plans from January 31, 2002 through the present, proprietary investment insurance products from January 31, 2002 through May 1, 2004 and annuities from January 31, 2002 through the present."

certification issues are before the court. For now, the court simply rejects, without prejudice to reconsideration at a later date, MetLife's arguments that the overly-broad product claims should be dismissed. Nothing stated in this order is intended to pre-judge any class issues.

IV. Conclusion

It is important to understand what this case does, and does not, involve. What is important here is (i) the relationship that existed between plaintiffs and Mr. Laxton, (ii) the service he allegedly provided, and the (iii) product that he sold. If the relationship had been a garden-variety brokerage relationship, plaintiffs would not have a case under the IAA. 15 U.S.C. § 80b-2(a)(11). If, contrary to plaintiffs' allegations, Mr. Laxton provided no investment advice, the result would be the same. And if the product had been a garden-variety insurance contract, with no features that made it a security, sold on a garden-variety commission basis (as garden-variety insurance salesmen have done for a very long time), plaintiffs would likewise have no case under the IAA. Conversely, if the product was a security, *and* if the relationship was an investment advisory relationship, *and* if investment advice was in fact provided, *and* if MetLife subverted a fiduciary relationship by, in effect, paying undisclosed "push money" (or its equivalent[7]), thus failing to make "full and fair disclosure of all material facts," Securities and Exchange Commission v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 194 (1963), then plaintiffs may have a case – at least they get past a Rule 12(b)(6) motion.

Defendants' request that the court take judicial notice of certain documents filed publicly with the SEC, and that the court consider those documents for purposes of defendants' motion to dismiss, is **GRANTED**. (Doc. no. 157.) The Third Amended

---

[7] Described by plaintiffs, in summary fashion, as "sales quotas, incentive programs, [and] draconian employment practices, among other things . . . ." Doc. No. 151, at 16.

Complaint states a claim for relief that is plausible on its face. Defendants' motion to dismiss the third amended complaint is **DENIED**. (Doc. no. 144.)

Dated this 16th day of October, 2008.

*[Signature]*

STEPHEN P. FRIOT
UNITED STATES DISTRICT JUDGE

07-0121p040(pub).wpd