## IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA

ROBERT L. THOMAS and AMANDA )
THOMAS, Individually and on Behalf )
of all Others Similarly Situated, )
                             )
     Plaintiffs, )
                             )
vs. )    Case No.  CIV-07-0121-F
                             )
METROPOLITAN LIFE INSURANCE )
COMPANY, and METLIFE )
SECURITIES, INC., )
                             )
     Defendants. )

## ORDER

Defendants Metropolitan Life Insurance Company and MetLife Securities, Inc. (collectively "MetLife") have moved for summary judgment on a threshold issue. (Doc. no. 190.)[1]  The question presented is whether plaintiffs' claims are excepted from coverage under the Investment Advisers Act.


## I.  Standards

Under Rule 56(c), Fed. R. Civ. P., summary judgment shall be granted if the record shows that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  The moving party has the burden of showing the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  A genuine issue of material fact exists when "there is

---

[1]This document was filed as a motion for leave to file a motion for summary judgment.  The motion was converted to defendants' motion for summary judgment on threshold issue.  (See order, doc. no. 193, noting no objection by MetLife.)

sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986). In determining whether a genuine issue of a material fact exists, the evidence is to be taken in the light most favorable to the non-moving party. <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 157 (1970). All reasonable inferences to be drawn from the undisputed facts are to be determined in a light most favorable to the non-movant. <u>United States v. Agri Services, Inc.</u>, 81 F.3d 1002, 1005 (10th Cir. 1996). Once the moving party has met its burden, the opposing party must come forward with specific evidence, not mere allegations or denials, demonstrating that there is a genuine issue for trial. <u>Posey v. Skyline Corp.</u>, 702 F.2d 102, 105 (7th Cir. 1983).

## II. <u>The Claims</u>

Based on prior rulings by the court and the fact that certain parties and claims have been dropped, Robert and Amanda Thomas now stand as the only remaining individually named plaintiffs in this action. The Thomases' only remaining claims are material omissions claims under §§206 and 215 of the Investment Advisers Act of 1940 ("the IAA"), 15 U.S.C. § 80b-5. (Third Amended Complaint, or "TAC," ¶ 1.) Although the Third Amended Complaint alleges that the Thomases bring this action individually and as a class action on behalf of all other persons similarly situated, no class issues have yet come before the court and none are addressed in this order.

The Third Amended Complaint alleges that the IAA imposes fiduciary obligations on all persons who engage in the business of giving investment advice within the meaning of the IAA, for a fee, and that MetLife's financial sales representatives violated that fiduciary duty when they failed to disclose to clients such as the Thomases conflicts of interest created by MetLife's commission structures, fees, job-retention policies and other incentives which gave MetLife representatives

a reason, in dealing with individuals such as the plaintiffs, to think first of their own financial interest in maximizing sales of MetLife's proprietary products.

With respect to the Thomases, the Third Amended Complaint alleges that on July 1, 2003, plaintiffs Robert and Amanda Thomas purchased one MetLife proprietary Flexible Premium Multifunded Life insurance policy.  This policy was a variable universal life insurance policy.  The Third Amended Complaint alleges that the Thomases purchased this policy based on the advice of Metlife financial advisor Jeffrey Laxton, also referred to as a MetLife financial sales representative.  Based on Mr. Laxton's failure to disclose his alleged conflict of interest to the Thomases at the time of their purchase, the Third Amended Complaint alleges that MetLife violated its fiduciary obligations owed to the Thomases under the IAA.  The Thomases seek restitution of all commissions and fees allegedly paid by them to MetLife in exchange for the financial advice they received from Mr. Laxton.  The Thomases allege such payments were included in the $91.00 monthly premium they paid.

### III. <u>Background Facts Taken as True</u>
<u>For Purposes of this Motion</u>[2]

As much as the plaintiffs would eventually like to expand the claims to include those of other plaintiffs, other product sales, and other occasions when investment advice was given to prospective class members who purchased MetLife products, it must be emphasized that, at this point, the only claims alleged in this action are the Thomases' claims based on investment advice given to them in June of 2003.[3]  That

---

[2]This is not a comprehensive statement of all facts taken as true.  These background facts are merely stated here to provide context for the court's determinations.

[3]*See*, Amanda Thomas deposition (doc. no. 190, ex. 1, pp. 127:22 - 136:8) and Thomases' answer to interrogatory no. 4 (doc. no. 190, ex. 7, pp. 9-ll) describing communications regarding (continued...)

advice resulted in the Thomases' purchase of one MetLife life insurance product, the previously identified variable universal life insurance policy. (*See*, TAC ¶¶ 13-14.) Many of the facts leading up to and surrounding that purchase are not in dispute. To the extent they are in dispute, the court has taken as true that version of events which most favors the Thomases' position.

The Thomases' daughter was born in April of 2003. The Thomases wished to undertake financial planning to provide for their daughter's future. In particular, they were interested in providing for their daughter's college education. Accordingly, in June of 2003, they met with Jeffrey Laxton, a representative of MetLife. The Thomases had known Mr. Laxton since 2001 when Mr. Thomas met Mr. Laxton through a friend at the car dealership where Mr. Thomas worked. Mr. Laxton provided investment advice to the Thomases from 2001 forward, and the Thomases had purchased other variable products from Mr. Laxton. During their meeting in June of 2003, Mr. Laxton followed MetLife corporate policy by conducting a "fact find" and analyzing the Thomases' current financial situation. In addition to reviewing the Thomases' risk tolerance, investment objectives and financial position, Mr. Laxton reviewed financial information the Thomases had previously provided to him. MetLife refers to this evaluation as a suitability analysis. At the meeting in June of 2003, Mr. Laxton advised the Thomases that a variable universal life insurance policy would be a good policy for the Thomases and a good investment for their daughter's future.

---

[3](...continued)
investments; of these, only communications in June of 2003 are within the class period. Evidence regarding other investment advice the Thomases contend Mr. Laxton provided to them (beginning as early as 2001 and some given after 2003) has been considered to the extent that it sheds light on the relationship between the Thomases and Mr. Laxton.

Acting on Mr. Laxton's advice, the Thomases purchased a UL 2001 Flexible Premium Multifunded Life Insurance Policy, a MetLife product, in June of 2003. The Thomases also followed Mr. Laxton's advice when allocating this investment among four sub-accounts. At the 2003 meeting, the Thomases wrote a check for the first $91.00 monthly premium for the variable life insurance policy. Since then they have paid MetLife a $91.00 monthly premium. The Thomases never paid Mr. Laxton or MetLife a separate fee for any investment advice provided to them.

## IV.  Discussion

MetLife contends that the investment advice services which Jeffrey Laxton rendered to the Thomases in connection with sale of the MetLife variable life insurance policy in June of 2003 are services that are excepted from coverage under the Investment Advisers Act. If MetLife is correct, defendants are entitled to summary judgment. The exception in question is the broker-dealer exception found in subsection (a)(11)(C) of the definitions section of the IAA. 15 U.S.C. § 80b-2(a)(11)(C). The sole issue is whether MetLife has carried its burden to show that this exception applies to the Thomases' claims as a matter of law.[4]

The broker-dealer exception states as follows.

---

[4]MetLife's moving brief appears to argue both that Mr. Laxton does not qualify as an investment adviser under the IAA's broad definition stated in subsection (11) and that, if the broad definition does apply, he comes within the broker-dealer exception to that broad definition stated in subsection (C) of subsection (11). (*See*, *e.g.*, doc. no. 190, pp. 29-31.) MetLife's reply brief, however, clearly narrows the issue to application of the broker-dealer exception (or exclusion). As stated there:  "The only question presented by this threshold motion for summary judgment is whether the services Jeff Laxton performed in connection with the 2003 sale of a MetLife variable life insurance policy to Robert and Amanda Thomas was 'investment advice' that falls outside [the] explicit exclusion for broker-dealers in the Investment Advisers Act of 1940 ('IAA')."  (Doc. no. 216, p. 1.)  Accordingly, the court presumes for purposes of this motion that Mr. Laxton and MetLife come within the broad definition of "investment adviser" stated at the beginning of subsection (11) and that if the broker-dealer exception does not apply, that there is coverage.

(11)  "Investment adviser" means any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as a part of a regular business, issues or promulgates analyses or reports concerning securities; but does not include...(C) any broker or dealer whose performance of such services[5] is solely incidental to the conduct of his business as a broker or dealer and who receives no special compensation therefor[6]....

15 U.S.C. § 80b-2(a)(11)(C) (emphasis showing exception).

Tracking the language of the exception as closely as possible while conforming it to the issues in this case, there are three requirements which MetLife must satisfy. MetLife must show that there is no genuine issue regarding each of the following material facts:

(1)     that Mr. Laxton was a broker of MetLife products;[7]

(2)     that Mr. Laxton's performance of investment adviser services for the Thomases was solely incidental to the conduct of Mr. Laxton's and MetLife's business as brokers of MetLife products; and

(3)     that Mr. Laxton received no special compensation for providing investment adviser services to the Thomases.

(1).  Broker

The Thomases' brief states that although Mr. Laxton's job title varied at times, his job was always the same.  As described by Mr. Laxton, his job was "The sale of

---

[5]The exception's reference to "such services" refers to the investment adviser services rendered by the broker or dealer.

[6]The exception's use of the word "therefor" refers back to "such services," which, in turn, refers to the investment adviser services rendered by the broker or dealer.

[7]The distinction between broker and dealer is not pertinent to the motion.

MetLife products." (Doc. no. 212, Thomases' Facts "TF" No. 46.)[8] It is undisputed that Mr. Laxton was employed by Metropolitan Life Insurance Company and that he was licensed as a registered representative of MLIC's affiliated broker-dealer, Metropolitan Securities, Inc., during the relevant time period. (Doc. no. 190, MetLife's Facts "MF" No. 3.) This action concerns Mr. Laxton's sale of a MetLife product to the Thomases for their account. There is no dispute that such a sale occurred or that Mr. Laxton acted as a broker of a MetLife product for purposes of the sale. The first of the three requirements is satisfied.

(2.) <u>Investment Adviser Services</u>

<u>Which Were "Solely Incidental"</u>

The second requirement is that the investment adviser services performed for the Thomases by Mr. Laxton acting on behalf of MetLife must have been services which were solely incidental to the conduct of Mr. Laxton's and MetLife's business as brokers of MetLife products. Whether this requirement is satisfied turns on the definition of "incidental" as used in the exception. MetLife's arguments presume that "incidental" means "attendant to" or "in connection with." The Thomases' arguments presume a different meaning; they presume that "incidental" means "a minor part of" or "an insignificant part of."

If MetLife is correct and "incidental" means "attendant to," there is no genuine issue of fact with respect to the "solely incidental" requirement. For example, the Third Amended Complaint alleges that Amanda and Robert Thomas each "purchased this product upon the advice of MetLife financial advisor Jeffrey Laxton." (TAC

---

[8]There is a dispute as to whether the court should consider Mr. Laxton's testimony. Out of an abundance of caution, the court has only relied on Mr. Laxton's testimony when the substance of the testimony is undisputed. Mr. Laxton's testimony is cumulative with respect to the other evidentiary points pertinent to this order. For that reason *only*, the court does not rely on Mr. Laxton's testimony elsewhere in this order.

¶¶ 13, 14.)  Thus, the connection between the investment advice and the purchase is fundamental to this action.  The evidence also establishes this connection.  For example, the Thomases' brief posits:

> -- that MetLife implemented its plan to sell products by offering advice to customers through its field service representatives  (TF No. 24);

> -- that "planning," "needs analysis," "fact find" and "suitability assessments" were synonymous at MetLife and were used as a means of selling products (TF No. 36);

> -- that Mr. Laxton provided advice to the Thomases in connection with all of their investment purchases including the variable universal life policy they purchased from MetLife in June 2003 (TF No. 72);

> -- that Mr. Thomas was not interested in buying insurance in June 2003 before hearing Laxton's advice; ultimately, however,  Mr. Laxton just basically said "this is . . .. what you need to buy now and this is how much money it will make bearing the market"  (TF No. 74);

> -- that Mr. Laxton advised the Thomases a variable universal life policy "would be a good policy for us, good investment for the future," and for their daughter's future (TF No. 75); and

> --  that the Thomases followed MetLife's advice to them and purchased a UL 2001 Flexible Premium Multifunded Life Insurance Policy from MetLife in June 2003 (Thomases' DMF No. 76).

Thus, there is no dispute that if "incidental" means "attendant to" or "in connection with," then the investment advice given by Mr. Laxton was solely incidental to the conduct of Mr. Laxton's and MetLife's brokerage business.

The Thomases, on the other hand, argue that the investment advice Mr. Laxton provided to them was not solely incidental to the conduct of his business as a broker of MetLife products because his advice was, to quote the Thomases' brief, "central,"

"core," or a "mandatory" feature of every customer sale by a MetLife representative including Mr. Laxton's sale of the life insurance policy to the Thomases in June of 2003. (Doc. no. 212, pp. 2, 10, 31, 36.) The Thomases' argument presumes that "incidental" means "a minor part of" or "an insignificant part of." If the Thomases' proposed interpretation of "incidental" is correct, then a genuine fact issue exists concerning whether the investment advice given by Mr. Laxton was a "solely incidental" part of -- *i.e.* a minor or insignificant part of -- the conduct of Mr. Laxton's and MetLife's business as brokers of MetLife products.

The court first considers the statutory language. If "incidental" means "attendant to," then its meaning has to do with the relationship between two things. In this sense, it is natural to speak of one thing being "*solely* attendant to" another thing. But it would be unusual to describe a thing as "*solely* inconsequential" to another thing, or as "*solely* a minor part of" another thing. The modifier "solely" does not fit well with this definition of "incidental." At the risk of parsing the statutory language too closely, the court's analysis of the language of the legislation cuts in favor of MetLife, but not compellingly so. The use of "solely" favors MetLife's proposed meaning of "incidental" in the phrase "solely incidental to."

In Financial Planning Association v. Securities and Exchange Commission, 482 F.3d 481 (D.C. Cir. 2007), a decision relied on by all parties, the D.C. Circuit vacated an SEC rule that the court found violated the IAA by improperly broadening the set of broker-dealers who came within the statutory exemption of subsection (11)(C). *Id.* at 396, 401. In reaching this conclusion, the court rejected the SEC's position that the congressional committee reports indicated that Congress, when it enacted the statute, was particularly concerned about the regulatory burdens on broker-dealers. *Id.* at 398. The legislative history which Financial Planning did rely on, however, included a Senate Report which stated that the "term 'investment adviser' is so defined as

specifically to exclude...brokers (insofar as their advice is merely incidental to brokerage transactions for which they receive only brokerage commissions)." *Id.* at 396, quoting S. Rep. No. 76-1775, at 22. To read "incidental" to mean "minor" as used in this sentence from the Senate Report would mean that Congress excluded brokers to the extent that their investment advice is merely a minor part of a brokerage transaction. This meaning makes little sense, however, because investment advice given by a broker would almost always play more than just a minor or insignificant role in a customer's decision to enter into a particular brokerage transaction. The court finds that the language of the Senate Report quoted in <u>Financial Planning</u> slightly favors MetLife's meaning of "incidental" as something which is "attendant to."

<u>Financial Planning</u> also quotes an early opinion letter from the SEC General Counsel, issued October 28, 1940. *Id.* at 398-99, n.7. To the extent pertinent here, the opinion letter states as follows.

> Clause (C) of section 202(a)(11) amounts to a recognition that brokers and dealers commonly give a certain amount of advice to their customers in the course of their regular business, and that it would be inappropriate to bring them within the scope of the Investment Advisers Act merely because of this aspect of their business.

*Id.*, quoting 11 Fed. Reg. 10,996 (Sept. 27, 1946) (reprinting SEC General Counsel opinion letter of October 28, 1940).[9]   The Thomases focus on the "a certain amount of advice" language in this letter and argue, essentially, that this phrase means a minor amount, or an insignificant amount, of advice. "A certain amount," however, can just as easily be read to indicate a notable or significant amount as it can be read as to indicate a minor amount. Accordingly, the reference to a "certain amount of advice"

---

[9]The text of this early opinion letter is found in the briefs at doc. no. 190, app. no. 2.

is not especially telling. The more telling word in this opinion letter is the reference to investment advice that is "commonly" given. This choice of words indicates that, at least in the opinion of the SEC at approximately the time of the IAA's passage, Congress understood it was exempting broker-dealers who "commonly" gave investment advice as a part of their brokerage business. Something that is common is unlikely to be minor or insignificant or rarely occurring. The court finds that the early SEC opinion letter cited in <u>Financial Planning</u> slightly favors MetLife's definition of "incidental."[10]

The court also notes but does not rely on the SEC's statement in IAA Release No. 2340, 70 Fed. Reg. 2716 at 2727 (January 14, 2005).[11] This SEC statement rejected reading "solely incidental" as requiring that the advice provided must be only incidental in the sense of minor, insignificant, periodic, or episodic advice about specific securities. The SEC rejected this reading on grounds of sentence structure and on historical and policy grounds, stating as follows.

> This [rejected] reading is based on the view that the statute excepts "solely incidental" advisory services instead of advisory services that are "solely incidental to" a broker-dealer's business, *i.e.* advisory services that are "liable to happen as a consequence of" or "follow[] as a consequence" of the conduct of a broker-dealer's business. Moreover, the view that only minor or insignificant advice is excepted by section

---

[10]Agency interpretations such as those in opinion letters lack the force of law; they are entitled to respect but only to the extent that they have the power to persuade. <u>Via Christi Regional Medical Center, Inc. v. Leavitt</u>, 509 F.3d 1259, 1272 (10th Cir. 2007), quotations and citations omitted.

[11]This release is found in the parties' briefs at doc. no. 190, app. no. 6. There is a dispute as to whether the court should rely on a proposed rule, the final version of which was vacated in <u>Financial Planning</u>. As the statement merely addresses the SEC's understanding of historical information, it is probable that reliance is appropriate for the limited purpose of showing the SEC's understanding of historical and policy considerations. In an abundance of caution, however, the court has not relied on this release or, in similar circumstances, on certain other releases which support MetLife's position.

202(a)(11)(C) ignores the fact that the advice broker-dealers gave as part of their traditional brokerage services in 1940 was often substantial in amount and importance to the customer. This has remained true throughout the following decades.

*Id*. at 2727.

The parties' arguments regarding the suitability analysis which Mr. Laxton conducted when he met with the Thomases in 2003 also bear on this issue. MetLife contends that its representatives conducted these analyses in order to have a reasonable basis to believe that a product was suitable for a customer before recommending that product to that customer. More specifically, MetLife contends that the suitability analysis conducted by Mr. Laxton in his meeting with the Thomases in June of 2003 was required in order to satisfy conduct rules of the National Association of Securities Dealers ("NASD," now the Financial Industry Regulatory Authority "FINRA," for convenience usually referred to in this order as the "NASD").[12] The

---

[12]FINRA is the successor to the NASD. It is the self-regulatory organization responsible for the oversight of securities firms and brokers doing business with the public. <u>Apollo Property Partners, LLC v. Newedge Financial, Inc.</u>, 2009 WL 778108 at *1-2 (S.D. Tex. ). FINRA creates internal rules of conduct governing its broker-dealer members. *Id*. FINRA/NASD Conduct Rule 2310 provides:

> Recommendations to Customers (Suitability). In recommending to a customer the purchase, sale or exchange of any security, a member shall have reasonable grounds for believing that the recommendation is suitable for such customer upon the basis of the facts, if any, disclosed by such customer as to his other security holdings and as to his financial situation and needs. Prior to the execution of a transaction...a member shall make reasonable efforts to obtain information concerning: the customer's financial status; the customer's tax status; the customer's investment objectives; and such other information used or considered to be reasonable by such member or registered representative in making recommendations to the customer. [Subsection letters deleted.]

The court notes, but does not rely on, the SEC's acknowledgment that brokers must perform suitability analyses. The SEC has stated: "We recognize that full-service broker-dealers must consider some aspects of financial planning when determining that their recommendations are (continued...)

Thomases do not dispute the fact that the NASD rules require broker-dealers and their representatives to have a reasonable basis to believe that a product is suitable for a customer prior to recommending that product to that customer; they argue that compliance with NASD suitability rules does not create an exemption from the IAA, but they do not dispute that Mr. Laxton was required to follow the NASD conduct rule.

The fact that broker-dealers such as Mr. Laxton are required to perform suitability analyses in connection with their product sales suggests that "incidental" should be construed to mean "attendant to" rather than "a minor part of." Otherwise, whenever suitability analyses are required, the brokers and dealers pursuing those transactions would be unable to rely on the broker-dealer exception in the IAA. This is because services that are required, and therefore always rendered, could never qualify as services that are "solely incidental" in the sense of "minor" or "insignificant" or "rarely occurring." On the other hand, the fact that suitability evaluations are required suggests that the investment advice given by Mr. Laxton to the Thomases in June of 2003 is an example of the type of attendant advice that Congress had in mind when it exempted advice "solely incidental to" the conduct of business as a broker or dealer. Accordingly, while the Thomases are correct that compliance with NASD suitability rules does not, in and of itself, create an exemption from the IAA, the existence of Conduct Rule 2310 is a fact which favors MetLife's position.

For these reasons the court finds that as used in the broker-dealer exception, "solely incidental to" means "solely attendant to" or "solely in connection with." The

---

[12](...continued)
suitable. We would not want our interpretation to interfere in any way with a broker's suitability analysis." (Doc. no. 190, app. no. 6, IAA Release No. 2340, 70 Fed. Reg. 2716, at 2729.)

second requirement for summary judgment is, therefore, satisfied because it is undisputed that the investment advice in issue was given in connection with the conduct of Mr. Laxton's and MetLife's business as brokers of MetLife products.

(3.)  <u>No Special Compensation for the Investment Advice</u>

The third requirement for summary judgment is that Mr. Laxton must have received "no special compensation" for providing the investment advice in question. As the Thomases' brief frames it:  "The inquiry on this prong is only, 'did the adviser get paid for providing investment advice?   If the answer is yes, the 'special compensation' requirement fails and the exception does not apply."  (Doc. no. 212, p. 40.)

As previously noted, subsection (11) of 15 U.S.C. § 80b-2(a), which sets out the broad definition of "investment adviser," begins with the following language.

> "Investment adviser" means any person who, for compensation, engages in the business of advising others...as to the value of securities or...the advisability of investing in, purchasing, or selling securities....

Later, in subsection (C) of subsection (11), where the broker-dealer exception to this general definition is stated, the statute does not refer to "compensation" but refers, instead, to "special compensation"; when other requirements are met, the exception applies to a broker or dealer "who receives no special compensation" for his investment adviser services.   Thus, the statute clearly differentiates between "compensation" and "special compensation."  *See*, <u>Russello v. U.S.</u>, 464 U.S. 16, 23 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion").

The Senate Bill quoted in <u>Financial Planning</u> states as follows.

> Before enactment of the IAA, broker-dealers and others who offered investment advice received two general forms of compensation.  Some

charged only traditional commissions (earning a certain amount for each securities transaction completed).  Others charged a separate advice fee (often a certain percentage of the customer's assets under advisement or supervision).  *See* 11 Fed. Reg. 10,996 (Sept. 27, 1946).  The Committee Reports recognized that the statutory exemption for broker-dealers reflected this distinction; the Reports explained that the term "investment adviser" was "so defined as specifically to exclude...brokers (insofar as their advice is merely incidental to brokerage transactions for which they receive *only* brokerage commissions).  S. Rep. No. 76-1775, at 22 [HA 164]; H. R. Rep. No. 76-2639, at 28 [HA 168].

Financial Planning, 482 F.3d at 485 and in part at 488 (with emphasis added by the circuit court at 488 only).  Thus, the Senate Bill interprets investment advice as qualifying for the exemption if the only compensation the broker receives is comprised of commissions, *i.e.* compensation for closing the sale as opposed to compensation, such as advice fees, for providing investment advice.

The SEC stated in a 1978 release that the examples of "special compensation" given in the previously quoted 1940 opinion letter from the SEC's General Counsel[13] "suggest that 'special compensation' for investment advice is compensation to the broker-dealer in excess of that which he would be paid for providing a brokerage or dealer service alone."  IAA Release No. 626, 43 Fed. Reg. 19224 at 19226 (May 4, 1978).[14]  That release further states:

The Division of Investment Management regards special compensation as existing only where there is a clearly definable charge for investment advice.  This reflects the Division's position that a client who perceives that he is paying a charge specifically for investment advice is entitled to the protections of the Advisers Act.

*Id.*

---

[13]The opinion letter is at 11 Fed. Reg. 10996, found in the briefs at doc. no. 190,  app. no. 2.

[14]This release is found in the briefs at doc. no. 190, app. no. 3.

A number of courts have interpreted "special compensation" similarly, to mean a charge to the customer beyond a traditional commission. *See*, *e.g.*, Luzerne County Retirement Board v. Makowski, 2007 WL 4211445, *54 (M.D.Pa. 2007) (summary judgment granted to defendant because plaintiff did not identify any evidence that alleged investment advisers received compensation specifically in return for providing investment advice to the Board; rather, all compensation was either in exchange for transaction-related services such as commissions or for administration of the fund; accordingly, there was no evidence of "special compensation" and, as a matter of law, the IAA did not apply); and Kaufman v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 464 F. Supp. 528, 537-38 (D.C. Md. 1978) (if defendant gave any investment advice it was incidental to his position as broker for the plaintiffs' accounts; where there was no indication that defendant received any fees specifically for his advice, and where commissions he received were for his services in effecting the transactions not for his rendering of advice, there was no evidence that defendant received any special compensation despite the large amount of brokerage commissions received; accordingly, services were encompassed by the exception of subsection (11)(C)).

It is undisputed that the Thomases were never presented with a separate charge exclusively as fees for financial advice.  (TF No. 85.)  The Thomases argue that the issue is not whether compensation for advice was paid separately from other compensation, but whether compensation was paid for the advice as opposed to for closing the sale.  Presuming *arguendo* that this is correct, all of the evidence regarding Mr. Laxton's compensation indicates that his compensation was for making the sale of the variable universal life insurance policy to the Thomases rather than for any investment advice he rendered to them.[15]

---

[15]The Thomases identify evidence showing that they paid a sales charge of 2.25% calculated
(continued...)

Unable to present evidence of any compensation which was specifically for having rendered investment advice to the Thomases, the Thomases argue that investment advice was among the services rendered to the Thomases by Mr. Laxton; that Mr. Laxton was compensated by MetLife for all of the services he rendered; with the result that Mr. Laxton was, necessarily, compensated for, among other things, the investment advice he rendered the Thomases. As Mr. Thomas put it at his deposition, "I'm pretty sure when I paid my money, that goes to pay for everything." (Doc. no. 212, ex. "L," pp. 153-154.) This argument, however, reads the word "special" out of the phrase "no special compensation." Also, as a practical matter, this argument would make potentially all brokers subject to the argument that they received "special compensation" for their investment advice services because they all are presumably compensated by their employers for revenue-generatiang activities. The court rejects the Thomases' argument and finds that there is no evidence that Mr. Laxton received "special compensation" for the investment advice he rendered to the Thomases.

---

[15](...continued)
on their $91.00 monthly premium, and that this disclosed sales charge amounted to $24.57 the first year the Thomases owned the policy. (Doc. no. 212, TF Nos. 91-92.) The Thomases contend MetLife paid Mr. Laxton $500.00 "for the services" which he provided. (Doc. no. 212, TF No. 93.) The "Field Representative's Report" which they cite for this contention, however, shows that $500.00 was paid to Mr. Laxton as a "Production Credit" for his sale of the universal life policy to the Thomases. (Doc. no. 190, ex. no. 5, p. 11.) Labels such as "sales charges" and "production credit" are not always meaningful; but here, there is no evidence that any of the premiums paid, or any of the compensation earned by Mr. Laxton, was for anything other than the sale of the insurance policy to the Thomases. The Thomases contend Mr. Laxton received other compensation in the form of contributions toward his life insurance, health insurance, and vacation time "Because he was *able to sell* the Thomases a proprietary VUL product...." (Doc. no. 212, TF No. 94, emphasis added.) The Thomases argue that field service representatives such as Mr. Laxton could not receive compensation for the sale unless they could prove they collected and analyzed the client's personal information and rendered advice accordingly. (See doc. no. 212, p. 43.) The court presumes the truth of this contention, but it does not suggest that representatives were compensated for providing investment advice. It merely shows that collecting and analyzing a customer's financial situation was a required step in the selling process leading to compensation for a closed sale.

-17-

Accordingly, the third and final requirement for application of the exception is satisfied.

## V. Conclusion

The merits of this action rest on allegations that MetLife, acting through Mr. Laxton, did not disclose the fact, when MetLife sold one of its proprietary products to the Thomases in June of 2003, that MetLife used its compensation scheme to incentivize Mr. Laxton to push MetLife's proprietary products. Plaintiffs seek to avail themselves of the IAA's federal fiduciary standard. (Doc. no. 212, p. 22.) MetLife protests that this "would result in the treatment of millions of ordinary securities sales as investment-adviser transactions." (Doc. no. 216, p. 10.) Thus, in the words of Chief Judge, later Justice, Cardozo, plaintiffs seek to hold MetLife to "the punctilio of an honor the most sensitive," while Met Life urges, in substance, that plaintiffs should be content with "the morals of the market place." Meinhard v. Salmon, 249 N.Y. 458, 164 N.E. 545, 546 (1928). Any salesman worth his salt can convey the reassuring impression that his recommendations are based on his unbiased evaluation of his prospect's needs. Where the product being sold is a sophisticated financial product, as the Thomases' variable life insurance policy surely was, it would seem that the need for unbiased advice – or at least for the disclosure of those things that might tend to skew the salesman's "advice" – would seem to be every bit as great as in a conventional advisory relationship. The court concludes, however, that the relevant statutory language, specifically the broker-dealer exception, precludes the application of the IAA's fiduciary standard to the Thomases' dealings with Mr. Laxton.

MetLife has prevailed on all three legs (broker status, advice "solely incidental" and "no special compensation") of its argument for application of the broker-dealer exception. Of these three legs, the weakest is the "solely incidental" issue. Given the

stark difference, in terms of legal result, between the two plausible interpretations of "solely incidental" that have been urged in this case, the lack of definitive appellate authority is remarkable.

This court's analysis of the statutory language, as applied to the facts in this record, has led to the conclusion that all prerequisites to the application of the broker-dealer exception, 15 U.S.C. § 80b-2(a)(11)(C) are satisfied here as a matter of law. MetLife's motion for summary judgment is accordingly **GRANTED**.

Dated this 31st day of August, 2009.

STEPHEN P. FRIOT
UNITED STATES DISTRICT JUDGE

07-0121p058(pub).wpd